[No. 8880.    Department Two.    December 8, 1910.]

THE STATE OF WASHINGTON, *Respondent*, v. PETER MILLER, *Appellant*.[1]

CRIMINAL LAW—EVIDENCE—CONFESSIONS—ADMISSIBILITY—DURESS. A confession is inadmissible as one obtained by duress, where it appears that the prosecuting attorney threatened the accused with a series of prosecutions which would culminate in cumulative sentences, unless he confessed, he was subjected to solitary confinement in a dark cell, and testified that he was subjected to severe cruelties and threatened with appalling punishments if he did not confess; and it appears that the jailors threatened many other prisoners if they did not confess, and confined them in the dark cell for refusal to do so.

CRIMINAL LAW—TRIAL—MISCONDUCT OF JURY—VIEW. There is such misconduct on the part of the jury as to require a reversal of a conviction, where it appears that the jury, on being sent to view a cell that had been occupied by the accused, inspected, on invitation, the office of a police captain who was an important factor in the prosecution, and it was alleged that such officer had assaulted the accused, and the captain conversed with the jurors on the subject of the assault, calling attention to the fact that the window gave full view from the street, and the jury was drawn into a social conversation with him.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered November 27, 1909, upon a conviction of burglary in the second degree, after a trial upon an information charging burglary in the first degree. Reversed.

[1]Reported in 111 Pac. 1053.

*Joseph M. Glasgow*, for appellant.

*George F. Vanderveer* and *Everett C. Ellis*, for respondent.

DUNBAR, J.—The prosecuting attorney of King county filed in the superior court of the state of Washington for said county an information, charging the defendant and one Willis Taylor, an accomplice, with the crime of burglary in the first degree. The defendant was arrested on the 22d day of June, 1909, and this information was not presented until the 10th day of August, 1909. In the meantime he was confined in the jail in the city of Seattle. A plea of not guilty was entered, the case was brought on for trial on the 29th day of October following, and on the 2d day of November the jury returned a verdict of guilty of burglary in the second degree. Throughout the trial of this case, the defendant conducted his own defense and appeared as his own counsel. Application for a new trial and motion in arrest of judgment were made and denied, judgment was announced, and appeal followed.

This conviction was obtained largely upon the alleged confessions of appellant and his accomplice, Taylor. At least, the confessions sworn to by the witnesses were an element in the case, and we must assume that such testimony may have been controlling in the minds of the jurors. The admission of this testimony is one of the errors assigned, it being the contention of the appellant, who appears here by counsel, that the testimony shows that these confessions were obtained by duress, and were not the character of confession which is specified in the law as the basis of conviction. We think this contention must be sustained. The trial was a long one and evidently exceedingly trying and vexatious to the trial court, who exhibited great patience and liberality towards the appellant throughout the trial. The record conclusively shows that the appellant possessed some little smattering of legal knowledge, and was exceedingly egotistical and vain over its acquirement; but this does not affect the main question of

whether the confessions were obtained by cruel treatment, threats, and persuasion.

According to the testimony of the appellant, the prosecuting attorney had threatened him with prosecution for divers and sundry crimes which would work cumulative sentences, in addition to other harsh treatment which it was claimed the appellant received at the hands of the prosecuting attorney. It was conceded by the prosecuting attorney that he had visited this appellant more than once at his cell, and once in company with the captain of the detectives, and with the prosecuting attorney of Spokane county. All the charges of cruelty were indignantly denied by the prosecuting attorney, but in answer to a question propounded by the appellant, if he had had such a talk with him, he did say this: "Under the laws of this state you could be charged with all these burglaries and your sentence would be tacked one on the other. I did tell him that. I suppose that was a sort of an implied threat. Otherwise I never said a word in any threatening manner." The prosecuting attorney was there for a purpose. The evident purpose was to obtain a confession from this appellant, and we think, under his own admission, that the threat which he made, or the implied threat as he terms it, was sufficient to render the confession made a confession obtained by duress. The appellant was confessedly a bright man and would understand, and it was no doubt intended that he should understand, that these cumulative sentences would follow if he did not confess. This is all that need be said so far as the testimony of the prosecuting attorney is concerned.

The appellant also testified that he was thrown into what he calls the "dark hole" in the jail; that he was maltreated, beaten with a bludgeon by the captain of the detective force, Tennant, and threatened with the most appalling punishments if he did not confess what he knew about this alleged burglary. The details of this alleged punishment and threats are too horrible and disgusting to set forth here. The only question is as to the truth of the statements made. These allegations of

threats and of barbarous treatment were denied by Captain Tennant, he claiming that he never had struck or abused the appellant, excepting once when the appellant attempted to assault him. Captain Tennant denied that he had ever put the appellant into the black hole or black cell; but it is conceded that appellant was confined in the black hole, and that he was there with the knowledge of Captain Tennant. While Tennant probably did not put him there, as naturally he would not, appellant was evidently ordered there by him, or if not by him, by some one in authority at the jail. It is not alleged or claimed anywhere that it was necessary to put appellant in this iron cell for the purpose of preventing an escape. The whole testimony shows conclusively that it was done for the purpose of extracting a confession from him. The same may be said of the treatment accorded the boy Willis Taylor.

The effect of solitary confinement on the mind of a person charged with crime may be imagined. It is a well-known psychological fact that men and women have frequently confessed to crimes which they did not commit. They have done it sometimes to escape present punishment which had become torture to them; sometimes through other motives; and the object of putting the inmates of this jail in this dark cell in solitary confinement is easily understood. To show the custom prevailing at that jail, many witnesses were introduced to testify as to the treatment that they had received while inmates of the jail. They all testified that there had been threats made to make them confess to the crimes with which they were charged, and that upon their refusal to do so, they had been put in this black hole. There was no denial by the officers of the jail that this had been done; nor did they always deny that it was done for the purpose of eliciting a confession. As showing by the testimony of the officers of the jail themselves the use to which the solitary cell was put, the jailor, Corbett, testified that it was common while the police department and the detectives were investigating a

case, sometimes taking them twenty-four hours, to put the person suspected into this dark cell. In answer to the question: "What did that man do that you put him in there?" he said:

"Mr. Holland had him arrested for selling a valise, and he lied so much, he said 'This man ought to be punished; he is the biggest liar I ever heard of,' so I just let him into the black hole, or the dark cell. Q. You admit then before this jury that you put him in the hole because he would not talk to suit the officer's purpose—you admit that before the jury? A. I admit that is what I put him in there for."

So that it seems that these officers, according to their own statement, not only put suspects in the black hole because they would not talk to suit the officers' purpose, or would not make confessions in regard to their own crimes, or in regard to crimes of somebody else, which they were presumed to know about; but that they had passed judicially upon their character and upon the crimes with which such persons were charged, and had them in there to punish them. The record is so full of this kind of testimony and so plainly indicates the fact that the sacred rights of citizenship had been invaded by the officers of the jail, the police and detective department, that it is scarcely necessary to cite further instances.

Neither policeman, detectives, nor jailors are clothed in this country with inquisitorial powers. It is true that some of the laws of Spain have been engrafted on ours; but not the dungeon, the bludgeon, the burning faggot, or any of the concomitant tortures of the Inquisition. These belong to the ages of bigotry, intolerance, and superstition, and have no place in our civilization. An attempt to revive them, even in a mild form, ought to call forth the execration of the people, and the severest condemnation of the law. In the necessarily slow process of evolution of sentiment, it has required centuries to establish the liberty of the subject at its present standard. The strangling hold of superstition, tyranny, and

oppression relaxed reluctantly, and after it has been once dethroned, an attempt to establish its dominion is an assault on liberty as unpatriotic as it is inhuman. It matters not that the victim may be guilty of the crime of which he is suspected, or for which he is arrested. These self-constituted judges might possibly be mistaken, for innocent men are frequently suspected and frequently arrested. In addition, the law throws its protecting aegis around the innocent and the guilty alike, on the assumption that every man is innocent until he is proven guilty, and demands that his guilt be clearly established before punishment is inflicted. This beneficent rule has been reversed by the practices shown by the record, and the presumption of guilt attaches with the suspicion. Showing the views of the court on these and similar practices, reference is made to *State v. McCullum,* 18 Wash. 394, 51 Pac. 1044, and *State v. Montgomery,* 56 Wash. 443, 105 Pac. 1035.

The misconduct of the jury is also alleged as error, and we think this contention must be sustained. It was the sworn contention of the appellant that, when he was taken to the office of the captain of detectives, Mr. Tennant, he was assaulted by the captain with a bludgeon, knocked down, and kicked into insensibility, and that, when he came to, he felt a sensation of something rough on his face, and discovered that his face was being licked by a bulldog. This was indignantly denied by Captain Tennant. At the close of the testimony in the case, the jury were sent out to view the cell in which the appellant had been confined, with the ordinary instructions to examine the cell and to have no communication with others on the subject of the trial. The examination was made, and what occurred while they were there is set forth in the evidence of two of the jurors, Morris Sobrato and C. W. White. Sobrato states in his affidavit that, after the jury

"Had descended by the elevator to the first floor, one of the men connected with the police department suggested that we [the jury] come into Captain Tennant's office; that we

were then conducted to the office of Captain Tennant, chief of detectives, and into the presence of Captain Tennant; that while there, one of the jurors picked up a pen or pencil lying on Captain Tennant's desk and made the remark, addressed to all of us, that this was the club or instrument with which the defendant Peter Miller had been beaten; Captain Tennant then said, in substance, that they had no other instrument of torture.   Some of the members of the jury were standing right by the window, and Captain Tennant called our attention to the fact that the window was next to the street, and that everything going on inside could be distinctly seen from the street.   Just before we left, Captain Tennant showed us a picture on the wall of Seattle's first chief of police."

The affidavit of White was substantially the same, with the addition that they were informed that Captain Tennant had invited the jurors to inspect his office, and that they went in there with the result specified in the other affidavit.   He also swears, in addition, that he heard one of the jurors say:   "I suppose that is the bulldog that licked Miller's face," and Tennant laughed and said, "That is the dog."   He also heard Tennant say:   "This office is right on the street, and any one can look from the sidewalk right into it."   There can be no reasonable contention that this was not misconduct on the part of the jury, and such misconduct as ought to reverse the judgment in this case.   The jury not only were drawn into a social communication with Captain Tennant, who was a very important factor in the prosecution of the appellant— which in itself was unfair to the appellant, but they received testimony there in relation to the club or bludgeon, and it was specially pointed out to them that the window was so low that anybody would see what was going on in the office, this evidently with the intention of impressing upon the jurors' minds that the violent scenes which were testified to by the appellant could not have occurred without being noticed by others from the outside.   It is not necessary to establish the fact that this was prejudicial error.   We think there are no cases which would hold to the contrary.

With the view we take of these two assignments discussed, it is not necessary to discuss the other assignments suggested. The judgment will be reversed.

RUDKIN, C. J., CROW, CHADWICK, and MORRIS, JJ., concur.