PEOPLE *v*. BROCKETT.

1. CRIMINAL LAW—EVIDENCE—CONFESSIONS—COERCION—DURESS.
   The confession of a young man under arrest on a criminal charge, signed by him after he had spent two nights on the cement floor of a cell without any bed, and after being persistently importuned by the officers to confess, was inadmissible in evidence, having been obtained by coercion.

2. SAME—VOLUNTARY CONFESSION—COERCION—"SWEATING."
   A confession, to be admissible, must be voluntary; that is, of the free will and accord of the defendant, without coercion whether from fear of any threat of harm, promise or inducement by hope of reward, or method known as "sweating."[1]

---

[1]The note referred to in the opinion herein, 18 L. R. A. (N. S.) 796, on voluntariness of confession made under arrest has been supplemented in 50 L. R. A. (N. S.), at page 1084.

3. SAME—INVOLUNTARY CONFESSION—HARMLESS ERROR.

It cannot be said that the admission of an involuntary confession was harmless error because there was sufficient evidence without the confession to warrant a conviction.

4. TRIAL—REQUESTS TO CHARGE—CRIMINAL LAW—CONFESSIONS.

A requested instruction to the jury that a so-called confession must be carefully scrutinized and weighed, and the burden is upon the people to show that it was made voluntarily, should have been given; and the charge as given, which did not challenge the attention of the jury to their duty to scrutinize and examine the alleged confession with great caution, was erroneous. *People* v. *Borgetto*, 99 Mich. 336.

5. CRIMINAL LAW—ROBBERY—ASSAULT—INSTRUCTIONS AS TO LESSER OFFENSE.

Under an information charging assault with intent to rob, an instruction that the offense included simple assault, followed by requiring a conviction as charged if respondent should be found guilty under the evidence and the law, was erroneous in that the jury were not distinctly instructed that they might find a verdict of simple assault only.

Exceptions before sentence from superior court of Grand Rapids; Dunham, J. Submitted January 11, 1917. (Docket No. 154.) Decided March 29, 1917.

William Brockett was convicted of assault with intent to rob, being armed with a dangerous weapon. Reversed.

*Alex. J. Groesbeck,* Attorney General, *Cornelius Hoffius,* Prosecuting Attorney, and *Fred P. Geib,* Assistant Prosecuting Attorney, for the people.

*Victor Hilding* (*Louis T. Herman,* of counsel), for respondent.

STONE, J. This case is before this court upon exceptions before sentence. The defendant, 19 years old, was arrested jointly with one Felix Bala, for as-

sault with intent to rob one Frank Kozak, they being armed with a dangerous weapon, to wit, a gun.

In the superior court of Grand Rapids the defendant was informed against alone, and was convicted of the offense as charged in the information. The offense is alleged to have been committed on the 8th day of February, 1916, at about 8:15 p. m., at the rear of Kozak's store on the east side of Diamond street in the city of Grand Rapids. The only eyewitness to the transaction was the said Frank Kozak. He claimed to have recognized the boys in the dark by "their voice and walk," and his previous acquaintance with them; and he also added that he recognized them by their clothes. It was the claim of Kozak that the assault occurred at the rear of his store as he was passing out of the door. His testimony tended to show: That the faces of the boys were covered by a sort of mask, that they approached him and made a demonstration commanding him to hold up his hands, and that defendant said: "We want to see your pockets, otherwise we will blow your guts out." That he then shut the door, waited a few moments, and went out, but the boys had in the meantime run away. There was some indefiniteness in the testimony of Kozak as to the recognition of the defendant. Both the boys were arrested that night about 11 o'clock, having been found at their respective homes. They were taken to police headquarters, separated, and the defendant, who had never been arrested before, was put in a cell the floor of which was cement, and the only furniture in it was a stool. He testified, and his testimony was undisputed, as follows:

"They put me in a cell; there was just a big place of cement inside. There were no beds. There was just a toilet and a place to get a drink; that is all that was in there. * * * There was no bed in that cell; just a cement floor."

Defendant was arrested on Tuesday night. The next morning he was taken to the chief of police's office, where he was interviewed by the chief of police. He denied any knowledge of the attempted holdup. He was then taken back to his cell, and seems to have been taken into the office of the chief of police on a number of occasions. The chief of police himself testified:

"I asked this boy questions a number of times. I would keep asking him questions. I don't remember just how I asked certain questions. In our method we have to ask questions if we want to get the truth out of them."

He remained in this cell until Thursday about noon, having spent two nights there upon the cement floor. The defendant was on Thursday taken to the office of the chief of police, and in the presence of the assistant prosecuting attorney, Glocheski, the chief of police, Albert A. Carroll, Frank Kozak, and detectives John O'Leary and Warren Sturgis, a statement was taken from him in answer to questions in the main put by the assistant prosecuting attorney, which covers about eight pages of the printed record, which statement was signed by defendant, and purports to have been sworn to by him before a notary public. After detailing at great length the commission of the offense charged, the statement closes in the following language:

"Q. Now all of these statements you have made here, Mr. Brockett, are made of your own free will, are they not?
"A. Yes.
"Q. You have not had any promises from the chief of police, Mr. Carroll, nor from the prosecutor or any one else?
"A. No.
"Q. You make them of your own free will.
"A. Yes.
"William Brockett, being first duly sworn, deposes

and says that the foregoing statements are true, and he made them of his own free will without any promises from the prosecutor's office nor the chief of police, nor the detectives in this case."

Upon the trial of the case there was evidence offered tending to show that the defendant was informed of his constitutional rights before making his statement. This was testified to by the assistant prosecuting attorney and the chief of police. William Sturgis had testified in police court that defendant was not informed of his constitutional rights until after the so-called confession was made, and it was excluded by the police court. Neither the witness John O'Leary nor the stenographer testified upon the subject.

It was the claim of the defendant, and he testified thereto, that he was not guilty of the offense charged, that he was not cautioned before making his statement, that he was kept in the cell two nights without any bed and slept on the cement floor, and was in what he termed a "nervous condition"; he testifying:

"They went after me pretty rough; they kept digging at me wanting me to tell, telling me all kinds of stuff; that I would get out of it, and such as like that. They got me so upset that I thought it would be all right if I would tell, then I would get out of it all right, so then I told.

"Q. What did you tell them?

"A. I told them just the way they told me. * * * They told it to me several times over so I understood it, and I up and told it to them the same way they told it to me. * * * I just followed the statements as they made it to me. * * * Mr. Carroll said I would get out of it if I told the truth about it, and he wouldn't listen to me tell what was really true, so I had to tell what he wanted me to. * * * I offered to tell the truth when I first started, but they wouldn't listen to the truth, so I thought the easiest way to get out of it, I was willing to do it. * * * They told me I would get clear if I told the truth, and I tried to tell the truth when I first started, but they wouldn't

listen to it; they said it was no such thing as that at all. They tried to tell me that I was telling a lie when I was trying to tell the truth. * * * I was rattled up; I don't hardly know which one was talking; they were both talking all the time together. * * * They drilled me for a day and a half before they ever had me say what I did. They had been drilling at me telling me all about this and asked me questions if I did it, telling me how it was done and all about it. Then of course I knew how it was done; I could get up and tell it. * * *

"*Q.* Didn't he tell you he wanted you to tell the truth?

"*A.* Yes, but he wanted me to tell it so that I did it, and I thought the best way, if I could get out of it, I would tell it that way. * * * The next morning after my arrest Carroll and Sturgis talked to me. They asked me if I knew about it. I says, 'No, I don't know anything about it.' Then they tried to say I did it, and I said, 'I didn't do it,' then they took me downstairs. Then they brought me up again.

"*Q.* What did they say to you that time?

"*A.* The same as they did before. They kept saying the same thing right over. They were telling me all about it, and asked me if I didn't do that, and asked me if I didn't stick a gun at him, and asked me if I didn't hold him up, and asked me if I wasn't there, and everything like that. * * * The first that they ever said to me to get me much scared was: 'If you can't tell the truth, we will have to hang you.' * * * Then Carroll got mad and said, 'If it lies in my power I will send you to Jackson prison.' When he said that, then afterwards I told him about it. * * *

"*Q.* What was it they said to you?

"*A.* They said, 'You will get out of it all right if you tell the truth;' but he says, 'If you don't tell the truth you can't get out of it then.'

"*Q.* Did you think you could get out of it if you made the statement?

"*A.* Yes, sir. * * * I believed if I made the statement that they would not do anything to me. I had no attorney up to that time. After I signed it he told me what it was, but I never knew until—not until this morning that it was ever to be used against me."

The foregoing testimony of defendant was denied by Carroll and others. The defendant testified that the statement was never read over to him, and that he never swore to it, but in this he was contradicted by the people's witnesses. The statement had been typewritten by the stenographer who took it, and defendant signed it some time after the statement was made. The court admitted the so-called confession in evidence over the objection and exception of defendant's counsel.

The court was requested to charge the jury as follows:

"I charge you, gentlemen of the jury, that the so-called confession and statement of the respondent, William Brockett, before the police officer must be most carefully scrutinized and weighed, and the burden of proof is upon the people to show that the statement was made voluntarily, without any influence being exerted by the officer, either by threats or promises of any kind."

This request was not given, but in its charge to the jury the court did use the following language:

"If you find that this alleged written confession was made by the respondent here voluntarily, that it was not made because of any promise of leniency being extended to him if he made it, and if you find that it was made by him not because of any promise, or any threat, coercion or intimidation, but that it was voluntarily and freely made by him, then you are to consider it as and with the other evidence in the case. If you find that this alleged confession was made simply because of promises held out to him, and which he believed, and if you find that those promises were the inducement causing the respondent to make such written confession, and that he would not have made it if it had not been for such promises, threats or intimidation, then you will discard and disregard it entirely; otherwise, if you find beyond a reasonable doubt that it was freely and voluntarily made, then you will consider it as part of the evidence in this case. A

confession freely and voluntarily made may be among the most effectual proof and is so regarded in law. But, as I have said, to make it admissible as evidence, it must be freely and voluntarily made, and you must so find beyond a reasonable doubt before you can consider it as evidence."

The court also charged the jury in the following language:

"I might say to you also that included in this offense is that of simple assault. If you find that this respondent was there on the night in question and pointed a revolver at this complaining witness, within three or four feet, or within two or three feet as he testifies, but that he did it without intending to frighten him, or without intending to shoot him, or without intending to rob him, then he would be guilty of simple assault. * * * If you should find the respondent guilty under the evidence and the law as I have given it to you, you will return a verdict of guilty as charged. If you do not so find, under the instructions I have given you, your verdict will be not guilty."

The jury having found the defendant guilty as charged, there was a motion for a new trial based upon many reasons, among them being:

Because the verdict was contrary to the weight of the evidence.

Because the court erred in admitting the so-called confession for the reason that it was not a voluntary confession.

That the court erred in not instructing the jury as requested by defendant's counsel.

That the court erred in directing the jury that if they found the defendant guilty, they must return a verdict of guilty as charged in the information.

The motion for a new trial was overruled and exceptions duly taken, and the same questions are here presented by numerous assignments of error.

A careful reading of the record in this case has satisfied us that the so-called confession of the defendant should not have been received in evidence;

or if received in evidence in the first instance, after it had appeared by the uncontradicted testimony of the defendant that he had been confined in the manner testified to by him for the length of time there stated, and had been persistently importuned by the officers to make a confession, the same should have been withdrawn from the consideration of the jury. We need only to cite our own cases upon this point. *Flagg* v. *People,* 40 Mich. 706; *People* v. *Wolcott,* 51 Mich. 612 (17 N. W. 78); *People* v. *Stewart,* 75 Mich. 21 (42 N. W. 662); *People* v. *Clarke,* 105 Mich. 169 (62 N. W. 1117); *People* v. *Prestidge,* 182 Mich. 80 (148 N. W. 347); *People* v. *McClintic,* 193 Mich. 589 (160 N. W. 461).

An instructive case is that of *Ammons* v. *State,* 80 Miss. 592 (32 South. 9, 92 Am. St. Rep. 607), reported with very ample notes in 18 L. R. A. (N. S.) at page 768. It was there held distinctly that the confession by a prisoner after being confined for several days in a "sweat box" is not admissible in evidence against him, although no threats or offers of reward were made to coerce, and he was merely told that it would be better for him to tell the truth. After describing the sweat box the court said:

"The prisoner was allowed no communication whatever with human beings. Occasionally the officer, who had put him there, would appear, and interrogate him about the crime charged against him. To the credit of our advanced civilization and humanity it must be said that neither the thumbscrew nor the wooden boot was used to extort a confession. The efficacy of the sweat box was the sole reliance. * * * The officer, to his credit, says he did not threaten his prisoner, that he held out no reward to him, and did not coerce him. Everything was 'free and voluntary.' He was perfectly honest and frank in his testimony, this officer was. He was intelligent, and well up in the law as applied to such cases, and nothing would have tempted

him, we assume, to violate any technical requirement of a valid confession—no threats, no hope of reward, no assurance that it would be better for the prisoner to confess. He did tell him, however, 'that it would be best for him to do what was right,' and that 'it would be better for him to tell the truth.' In fact, this was the general custom in the moral treatment of these sweat box patients, since this officer says, 'I always tell them it would be better for them to tell the truth, but never hold out any inducement to them.' He says, in regard to the patient, Ammons, 'I went to see this boy every day, and talked to him about the case, and told him it would be better for him to tell the truth; tell everything he knew about the case.' This sweat box seems to be a permanent institution, invented and used to gently persuade all accused persons to voluntarily tell the truth. Whenever they do tell the truth—that is, confess guilt of the crime— they are let out of the sweat box. Speaking of this apartment, and the habit as to prisoners generally, this officer says: 'We put them in there [the sweat box] when they don't tell me what I think they ought to.' This is refreshing. The confession was not competent to be received as evidence. 6 Am. & Eng. Enc. of Law, p. 531, note 3; *Id.*, p. 550, note 7; *Hamilton v. State*, 77 Miss. 675 (27 South. 606) ; *Simon v. State*, 37 Miss. 288. Defendant, unless demented, understood that the statement wanted was confession, and this only meant release from this 'black hole of Calcutta.' Such proceedings as this record discloses cannot be too strongly denounced. They violate every principle of law, reason, humanity and personal right. They restore the barbarity of ancient, and medieval methods. They obstruct, instead of advance, the proper ascertainment of truth. It is far from the duty of an officer to extort confession by punishment."

The case was reversed upon that sole ground. That such confessions are obtained by duress, see *State v. Miller*, 61 Wash. 125 (111 Pac. 1053), reported with notes in 1912B, Am. & Eng. Ann. Cas. 1053; *People v. Loper*, 159 Cal. 6 (112 Pac. 720), reported in 1912B, Am. & Eng. Ann. Cas. 1193; *Commonwealth v. Mc-*

*Clanahan,* 153 Ky. 412 (155 S. W. 1131), reported in 1915C, Am. & Eng. Ann. Cas. 132.

Proof of a confession is never admissible unless it is voluntarily made, and by the word "voluntary" is meant that the confession must be of the free will and accord of the defendant, without coercion whether from fear of any threat of harm, promise or inducement by hope of reward, or method known as "sweating."

In our opinion the means used by the uncontradicted evidence in the instant case must have so agitated the mind of the defendant as to arouse his fear, and to have a coercive effect. Therefore the confession was not voluntary. We do not mean to hold that a voluntary confession may not be made by one charged with crime and under arrest, for such confessions often have been admitted, and will be admitted by the courts as competent, but they should come from the defendant under such circumstances as show them to be made of his free will, and with full and perfect knowledge of their nature and consequences, free from the dictation and coercion of others.

It is said on behalf of the people that there was sufficient evidence to warrant a conviction of the defendant without the confession. Without conceding that this is true (for it appears to us that the case was a close one upon the facts), yet it should be said that the fact that evidence other than the alleged confession was sufficient to justify a conviction did not make the admission of the confession, improperly extorted, harmless, as it cannot be said what weight the jury gave to the confession in reaching their verdict.

We are of the opinion that the request to charge, proffered by defendant, or its substance, should have been given by the trial court. The charge, as given, did not clearly challenge the attention of the jury to

their duty to scrutinize and examine the alleged confession with great caution. For language appropriate in such a charge, as approved by this court, see *People* v. *Borgetto,* 99 Mich. 336, 338 (58 N. W. 328).

Although the trial court, in its charge, stated that a simple assault was involved, the jury were not distinctly instructed that they might find a verdict of simple assault only. At least the closing words of the charge are inconsistent with that idea, and such we understand to be the view of the learned trial judge, for he says, in denying the motion for a new trial:

"The fourteenth assignment, I think, is not error, as the court remembers correctly no request was made for such a charge, and a verdict of that kind would not have been supported by the evidence."

This relates to the specific point that the court erred in not charging the jury that they could bring in a verdict of simple assault. The rule as to conflicting charges is stated in *Madill* v. *Currie,* 168 Mich. 546, 560 (134 N. W. 1004). We find no other reversible error in the record.

For the errors pointed out the conviction of the defendant is set aside and reversed, and a new trial ordered.

KUHN, C. J., and OSTRANDER, BIRD, and BROOKE, JJ., concurred with STONE, J.

MOORE and STEERE, JJ., concurred in the result.

FELLOWS, J., did not sit.