PEOPLE v ARROYO

Docket No. 72103. Submitted June 6, 1984, at Lansing.—Decided September 21, 1984.

Following a bench trial in the Washtenaw Circuit Court, the trial court, Henry T. Conlin, J., found the defendant, Arthur R. Arroyo, to be legally sane and convicted the defendant of breaking and entering with intent to commit larceny and of arson of a building. Defendant's motion for a new trial was thereafter denied. Defendant appeals by leave granted raising several issues including an allegation that his confession to police detectives was not voluntary. *Held:*

1. The defendant's confession was voluntary. Viewed in the totality of the circumstances, the interrogation by the detectives was not so inherently coercive as to vitiate the voluntariness of defendant's *Miranda* waiver and the ultimate confession. Defendant's waiver was knowing, intelligent and voluntary under the circumstances.

2. Defendant's in-court admissions were not the "fruit of the poisonous tree" of an involuntary confession.

3. The trial court did not err in ruling that the prosecution had proven beyond a reasonable doubt that defendant was sane at the time of the commission of the crimes.

4. All of the elements of arson were proven beyond a reason-

REFERENCES FOR POINTS IN HEADNOTES

[1, 4] 21A Am Jur 2d, Criminal Law § 936 *et seq.*
    29 Am Jur 2d, Evidence §§ 555-557, 614.
    Necessity of informing suspect of rights under privilege against self-incrimination, prior to police interrogation. 10 ALR3d 1054.
[2] 29 Am Jur 2d, Evidence § 590.
[3, 5] 29 Am Jur 2d, Evidence §§ 529, 543 *et seq.*
[6] 21 Am Jur 2d, Criminal Law § 76.
    29 Am Jur 2d, Evidence § 158.
    30 Am Jur 2d, Evidence § 1177.
    Modern status of rules as to burden and sufficiency of proof of mental irresponsibility in criminal case. 17 ALR3d 146.
[7] 21 Am Jur 2d, Criminal Law § 104.
    30 Am Jur 2d, Evidence § 1161.
    31 Am Jur 2d, Expert and Opinion Evidence § 85 *et seq.*
[8] 58 Am Jur 2d, New Trial § 165.

able doubt at trial. The trial court did not abuse its discretion in denying defendant a new trial or an evidentiary hearing based on alleged newly-discovered evidence regarding whether the defendant used an accelerant to fuel the fire. Defendant admitted setting the fires and the alleged new evidence was irrelevant to his claim that the crime of arson had not been proved.

Affirmed.

1. CRIMINAL LAW — EVIDENCE — FIFTH AMENDMENT — *MIRANDA* WARNINGS — CONSTITUTIONAL LAW.

A prosecutor, prior to the admission of a defendant's statements at trial, must first make an affirmative showing that *Miranda* warnings were given to the defendant and that a waiver was properly obtained (US Const, Am V).

2. CRIMINAL LAW — EVIDENCE — APPEAL — CONFESSIONS — VOLUN- TARINESS.

The Court of Appeals, in reviewing a trial court's determination regarding the voluntariness of a defendant's confession, reviews the entire record and makes an independent determination; the trial court's ruling will be affirmed unless clear error appears, such that the Court of Appeals has a definite and firm conviction that a mistake has been made; the Court of Appeals will defer to the trial court's finding if the evidence is conflicting and the determination of voluntariness is largely dependent on the credibility of the witnesses.

3. CRIMINAL LAW — EVIDENCE — CONFESSIONS — CONSTITUTIONAL LAW.

An involuntary confession is always inadmissible because the police broke the law and because it is of questionable trustworthiness (US Const, Am V).

4. CRIMINAL LAW — EVIDENCE — CONFESSIONS — CONSTITUTIONAL LAW.

Courts, in reviewing the voluntariness of a confession, must look to whether the purported waiver of the right against self incrimination was knowing and intelligent under the totality of the circumstances (US Const, Am V).

5. CRIMINAL LAW — VOLUNTARINESS.

The relevant factors to be considered in determining the voluntariness of a criminal defendant's statements are: (1) the duration and conditions of detention, (2) the attitude of the police towards the accused, (3) the physical and mental state of the

accused, and (4) the diverse pressures which sap or sustain the accused's power of resistance or self-control.

6. CRIMINAL LAW — DEFENSES — INSANITY — BURDEN OF PROOF.

The prosecution, once the defense of insanity is introduced, has the burden of proving the defendant's sanity beyond a reasonable doubt.

7. CRIMINAL LAW — DEFENSES — INSANITY — BENCH TRIALS.

The trial court, in a bench trial in which the defense of insanity is introduced, is free to determine from conflicting expert testimony that the defendant was sane beyond a reasonable doubt.

8. NEW TRIAL — NEWLY-DISCOVERED EVIDENCE.

The grant or denial of a new trial on the basis of newly-discovered evidence is within the sound discretion of the trial court; one requirement for the granting of a new trial based on newly-discovered evidence is that the evidence is such as to render a different result probable on a retrial of the case.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *William F. Delhey,* Prosecuting Attorney, and *David A. King,* First Assistant Prosecuting Attorney, for the people.

*Dale J. Crowe,* for defendant on appeal.

Before: GRIBBS, P.J., and BRONSON and SHEPHERD, JJ.

PER CURIAM. After a bench trial, defendant was found legally sane and convicted of breaking and entering with intent to commit larceny, MCL 750.110; MSA 28.305, and arson of a building, MCL 750.73; MSA 28.268. Defendant's motion for a new trial was denied and he appeals by leave granted. We affirm.

On November 27, 1981, defendant broke into the Economics Building on the campus of the University of Michigan in Ann Arbor. On December 24, 1981, defendant again entered the building and set fire to it. Defendant was taken into custody by the

Ann Arbor police on the breaking and entering charge at the United States Secret Service Office in San Diego, California, on February 11, 1982. He had voluntarily responded to a request to come to that office to discuss alleged threats he had made against the President of the United States.

Defendant waived extradition and he was transported back to Ann Arbor by commercial flight on February 12, 1982. During the trip, he signed a *Miranda* waiver and confessed to both the breaking and entering and the arson of the Economics Building. A *Walker* hearing was held on August 4 and September 7, 1982, to determine the voluntariness of the confession. The court ruled that defendant's confessions were made after a voluntary waiver of his *Miranda* rights.

At trial defendant raised the defense of insanity, with the opposing sides presenting their own expert witnesses. Defendant was found sane by the trial court. After trial, the court denied defendant's motion for a new trial or an evidentiary hearing on new evidence that defendant alleged would discredit the testimony of the State Fire Marshal with respect to the arson. Defendant raises several issues on appeal, none of which require reversal.

Defendant first argues that the trial court erred in determining that defendant's out-of-court statements were not obtained in violation of *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). In *Miranda,* the United States Supreme Court set forth the Fifth Amendment procedural safeguards which must be employed to protect an accused's rights against self-incrimination when he is subjected to custodial interrogation.

Prior to the admission of a defendant's statements at trial, the prosecutor must first make an affirmative showing that such warnings were given

and that the waiver was properly obtained. *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965). The gist of *Miranda, supra,* is that, although a defendant's statement may not be "involuntary" when judged by traditional coercion standards, "the process of in-custody interrogation", without appropriate safeguards, contains "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely". In this case, the trial court ruled that defendant's confession was "voluntarily made" to the detectives "who obviously had attempted to do everything in their power to protect the man's rights".

Defendant argues on appeal that his confession was involuntary and should have been suppressed because it was a product of psychological coercion. The standard applied by this Court requires that the entire record be reviewed and an independent determination made to establish the voluntariness of defendant's confession. *People v Rowen,* 111 Mich App 76; 314 NW2d 526 (1981). The trial court's ruling on voluntariness should be affirmed unless clear error appears, such that this Court has a definite and firm conviction that a mistake was made. *People v Price,* 112 Mich App 791; 317 NW2d 249 (1982), *lv den* 414 Mich 946 (1982). Moreover, if the evidence is conflicting and the determination of voluntariness is largely dependent on the credibility of the witnesses, this Court should defer to the trial court's finding. *People v Anglin,* 111 Mich App 268; 314 NW2d 581 (1981).

Defendant's arrest and the events which were the subject of the *Walker* hearing occurred as follows. On February 11, 1982, defendant voluntarily went to the United States Secret Service Office in San Diego, California, for questioning regarding

alleged threats against the President of the United States. In that office, while in custody of the Secret Service, two officers from the Ann Arbor Police Department arrived. They informed him that they had a warrant for his arrest on a breaking and entering charge.

The defendant told the officers he did not wish to make any statement, and Detective Roderick of the Ann Arbor police told him he would not ask him any questions about the actual incident, but that he needed to know what he wanted to do about extradition. The defendant stated that he would like to talk to an attorney about extradition and the detectives arranged to take him to the San Diego County Felony Arraignment Court, where he spoke privately with a public defender on duty. He was then arraigned by a San Diego County Judge and, at that time, formally waived extradition.

The detectives then asked defendant if there was anything else he wanted to discuss privately with the attorney before he was lodged in the county jail overnight until their departure. Defendant replied that he did not want to talk to the attorney about anything else, but asked the detectives to get his belongings from the rented room where he had been staying. Defendant specifically requested that the officers bring him his rosary and Bible, and signed a consent form to allow the search.

While he was lodged in the San Diego County Jail, defendant called his parents and apparently asked them to get him an attorney. His father told him they did not have enough money. He also called a friend, Michael O'Connor, in Ann Arbor, but defendant could not remember the substance of the conversation. O'Connor testified that he warned defendant that he should not speak to

anyone or say anything about what had happened without legal counsel. After talking to defendant, O'Connor contacted an attorney in Ann Arbor on defendant's behalf.

On February 12, 1982, the attorney engaged by O'Connor, Molly Reno, telephoned the Ann Arbor Police Department and asked to speak with either Detective Branson or Roderick. When she was unable to reach them, she told the person answering the telephone in the detective bureau that she would be representing defendant and that she did not want him questioned without her being present.

That same day, the detectives checked defendant out of the San Diego Jail and boarded a commercial flight for the return trip to Ann Arbor. The trip was to Detroit by way of Dallas, and took 18 to 19 hours. It appears undisputed that the detectives had no knowledge of Ms. Reno's actions in Ann Arbor before they left San Diego or during the course of the flight. The defendant was given his Bible and rosary either on the way to the airport or after he boarded the plane. In the early part of the flight, he sat between the detectives and prayed his rosary. Also during the first couple of hours of the flight, the detectives and defendant ate dinner and discussed general subjects.

Both detectives stated that after dinner defendant suddenly asked if the detectives wanted to talk about the case. Defendant could not recall making such a statement. At that point Detective Roderick told defendant that some of his friends in Ann Arbor with whom the detectives had talked about the breaking and entering were concerned about how defendant viewed them in light of the fact that they had talked to the police. The detectives told him that his friends could not condone what he had done, but that they still considered

themselves his friends. Then Detective Branson talked to defendant about his Catholicism, about religious confession and about getting things off his chest. The detectives went on to tell defendant that they thought he was one of those kind of people who felt remorse over what had happened. Branson testified that defendant began to cry near the end of his talk. Defendant testified that he told the detectives "I did it" before he began to cry. The detectives then went over the *Miranda* warnings, item by item, with defendant. Defendant signed the legal pad containing the warnings, and both detectives also signed.

Defendant then admitted responsibility for the breaking and entering as well as the arson. Branson testified that the preliminary discussions leading up to the *Miranda* warnings and the confession took about 15 to 20 minutes. Coupled with the confession itself, the entire conversation consumed about 45 minutes.

At the conclusion of this discussion, there was no further questioning about the two crimes for the remainder of the trip. It was not until the detectives arrived back at their office in Ann Arbor on February 13, 1982, that they received a letter from Ms. Reno advising them that she did not want the detectives to discuss the case with defendant. Detective Roderick called Ms. Reno and informed her that defendant had given them a statement on the plane. Ms. Reno immediately went to the station to talk with defendant and appeared the following day at arraignment for the defendant. She later withdrew from the case, due to a potential conflict in representing him.

Defendant analogizes the facts of this case to *Brewer v Williams,* 430 US 387; 97 S Ct 1232; 51 L Ed 2d 424 (1977), see also *Nix v Williams,* — US —; 104 S Ct 2501; 81 L Ed 2d 377 (1984). In

*Brewer,* the defendant, Williams, had turned himself in to the police in a city 160 miles from the city where he was wanted for the murder of a young girl. He had consulted with an attorney there, who advised him to remain silent and told the officers returning the defendant not to interrogate him. Knowing that the defendant was deeply religious, the officers subjected him to what has become known as the "Christian burial speech". Addressing the defendant as "Reverend", they convinced him to show them the whereabouts of the girl's body so that she could get a decent Christian burial. In federal habeas corpus proceedings, the United States District Court ruled *inter alia* that Williams' self-incriminating statements had been involuntarily made. However, the United States Supreme Court decided the case not on the Fifth Amendment voluntariness issue, but on the Sixth Amendment denial of counsel issue. The Court held that because judicial proceedings had begun, a warrant had been issued and the defendant arraigned, defendant had the right to legal representation when he was interrogated. The Court found that the police detective's "Christian burial speech" was tantamount to interrogation so as to entitle Williams to the assistance of counsel at the time he made his incriminating disclosures. Furthermore, in light of Williams' assertions of his right to counsel, there was no reasonable basis for finding that he had waived that right.

The case at bar is distinguishable for several reasons. First, the defendant in this case received *Miranda* warnings prior to his confession on the airplane. When he began to confess, the detectives stopped him and went through the required warnings line by line. In *Brewer, supra,* the interrogating detective did not both to preface his efforts by reiterating defendant's *Miranda* rights.

Second, the defendant in this case spoke with an attorney only about extradition back to Michigan. When the detectives inquired whether he wished to speak to the San Diego County Public Defender about anything else defendant told them that he did not. In *Brewer, supra,* Williams secured and spoke with an attorney prior to his trip, where-upon defendant was advised to remain silent and the detectives were instructed not to question defendant.

A third factor distinguishing this case from *Brewer, supra,* is the fact that defendant in this case made two long-distance telephone calls on the evening of his arrest while he was lodged at the San Diego County Jail. He spoke to his parents and his friend O'Connor. His friend O'Connor warned him not to say anything to the officers and offered to get him an attorney. The attorney O'Connor hired was waiting for defendant when he returned to Ann Arbor and handled his arraignment the following morning. Although the attorney attempted to contact the detectives to inform them not to interrogate the defendant, the detectives never received her communication prior to their return to Ann Arbor. In contrast, in *Brewer, supra,* the detectives were explicitly warned not to attempt to interrogate Williams but ignored the warning.

Furthermore, in the case at bar, the detectives testified that defendant himself initiated the conversation, although defendant testified that he could not recall making such a statement. In *Brewer, supra,* the detectives took the initiative in interrogating the defendant. Thus, we conclude that *Brewer, supra,* is not applicable to this case. See *People v Manges,* 134 Mich App 49; 350 NW2d 829 (1984).

The more pertinent issue on appeal is the volun-

tariness of defendant's confession. An involuntary confession is always inadmissible not only because the police broke the law but also because it is of questionable trustworthiness. *People v Reed,* 393 Mich 342, 355; 224 NW2d 867 (1975), *cert den* 422 US 1044, 1048; 95 S Ct 2660, 2665; 45 L Ed 2d 696, 701 (1975). In reviewing the voluntariness of a confession, the courts must look to whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances. *Edwards v Arizona,* 451 US 477, 486, fn 9; 101 S Ct 1880; 68 L Ed 2d 378 (1981). Michigan courts have set out some of the relevant factors used to review the voluntariness of a confession: (1) the duration and conditions of detention, (2) the attitude of the police towards the accused, (3) the physical and mental state of the accused, and (4) the diverse pressures which sap or sustain the accused's power of resistance or self-control. *Price, supra,* p 797; *Anglin, supra,* p 280; *People v Allen,* 8 Mich App 408, 412; 154 NW2d 570 (1967), *rem gtd* 382 Mich 780 (1969), citing *Culombe v Connecticut,* 367 US 568; 81 S Ct 1860; 6 L Ed 2d 1037 (1961).

Examining these factors in light of this case leads us to conclude that defendant's confession was voluntary. First, the duration and conditions of defendant's detention were not such as to coerce his confession. Defendant had been detained first by the Secret Service and then by the Ann Arbor detectives for about 36 hours before he confessed. He had slept for about 5-1/2 hours and had breakfast at about 6 a.m. in the jail on the day of the return flight. He was picked up about noon and, although he missed lunch, he ate dinner on the plane at about 4:30 p.m. He confessed shortly after dinner. He was not handcuffed or restrained, although at one point during the confession each

detective was holding his hand. Defendant was not purposely being held incommunicado to force the confession. He was not unduly detained or purposely subjected to unpleasant circumstances. The duration of his trip was only as long as that needed to arrest, extradite and transport him back to Ann Arbor. Second, the attitude of the police toward the accused did not evidence an intent to coerce defendant. Defendant admitted that the officers were sensitive and compassionate toward him and were never abusive. He argues that because the police were indifferent to him after he confessed this was a ruse to encourage false trust by defendant. There is no evidence to indicate that this was the officers' intent. In fact, they claimed they were surprised when defendant offered his confession.

We next consider the third and fourth factors, the "physical and mental state of the accused" and "the diverse pressures which sap or sustain the accused's power of resistance or self-control". Physically, there was nothing to seriously indicate a problem with the confession. On the other hand, defendant's religious beliefs and emotional problems could have affected the voluntariness of the confession. However, even at trial defendant testified that he confessed because "I wanted to be truthful * * * because Jesus * * * himself, was honest, you know". With respect to the fourth consideration, defendant could have been affected by the detective's statements about confession, about his friends and about defendant's being the type of person who makes a mistake but is not a repetitive type of criminal. However, prior to defendant's confession, defendant was warned of his *Miranda* rights, line by line. He had a break from any pressure which was imposed by the detectives and still could have reconsidered his decision to

confess. Defendant's *Miranda* rights were hand-written on a legal pad. Defendant signed and inserted the date below the listed rights. The detectives witnessed his signature. Immediately beneath the signatures the following statement appeared:

"I Arthur Raoul Arroyo do understand the above listed rights and do wish to speak with Detectives Roderick & Branson of the Ann Arbor Police Department at this time."

This statement was again signed and dated by defendant and witnessed by both detectives. Given ample opportunity to reconsider, the defendant then confessed.

Viewed in the totality of the circumstances, *Edwards, supra,* the interrogation by the detectives was not so inherently coercive as to vitiate the voluntariness of defendant's *Miranda* waiver and the ultimate confession. Defendant's waiver was knowing, intelligent and voluntary under the circumstances.

Defendant's second argument, that his in-court admissions were the "fruit of the poisonous tree" of the involuntary confession, need not be addressed. Having decided that defendant's *Miranda* waiver and confession were voluntary, defendant's in-court admissions were not tainted.

Defendant next argues that the trial court erred in ruling that the prosecution had proven beyond a reasonable doubt that defendant was sane at the time of the commission of the crimes. The defendant's expert witness testified that defendant was legally insane. He based his opinion upon an hour and one-half interview with defendant as well as an evaluation of the Minnesota Multiphasic Personality Inventory (MMPI) test administered by

the Forensic Center and his administration of the Rorschach Diagnostic Test. The prosecution's expert witness from the Forensic Center testified that defendant was, in his opinion, not legally insane at the time of the crimes and that defendant was not even mentally ill under Michigan statutes. He based his opinion on two interviews with defendant totaling five hours. After reviewing the testimony of the experts in this case, we find that the prosecution met its burden of proof beyond a reasonable doubt. *People v Murphy,* 416 Mich 453; 331 NW2d 152 (1982), *reh den* 417 Mich 1113 (1983). The crux of this issue was which expert was more credible, and the trial court was free to determine from conflicting testimony that the defendant was sane. *People v Culpepper,* 59 Mich App 262, 265-266; 229 NW2d 407 (1975), *lv den* 399 Mich 854 (1977).

Defendant also argues that the trial court erred in denying defendant's motion for a new trial on the basis of newly-discovered evidence without first holding a hearing on the matter. Prior to sentencing, defendant moved for a new trial or, in the alternative, an evidentiary hearing. He alleged that he discovered new evidence which would discredit the validity of the State Fire Marshal's scientific techniques in establishing arson. The grant or denial of a new trial based upon newly-discovered evidence is within the sound discretion of the trial court. *People v Somma,* 123 Mich App 658; 333 NW2d 117 (1983); *People v Duncan,* 96 Mich App 614; 293 NW2d 648 (1980), *rev'd on other grounds,* 414 Mich 877; 322 NW2d 714 (1982).

One requirement for the granting of a new trial based upon newly-discovered evidence is that the evidence is such as to render a different result probable on a retrial of the case. *Somma, supra;*

*Duncan, supra.* In this case, four experts testified on the question of arson. While the testimony varied as to the type of accelerant used to start the fire and defendant denied any use of accelerant, defendant admitted that he set several fires among stacks of books in the building. While there might have existed a reasonable doubt about whether defendant had used an accelerant to fuel the fire, any new evidence on this subject was irrelevant to the crime of arson. At trial, all the elements of arson were proven beyond a reasonable doubt. Thus, the trial court did not abuse its discretion in denying defendant a new trial or an evidentiary hearing on the newly-discovered evidence.

Defendant finally argues that the judgment of the trial court was clearly erroneous. This argument is merely a summary of defendant's prior four arguments. His claims of error were fully considered and do not require reversal.

Affirmed.