PEOPLE v WRIGHT

Docket No. 90512. Argued May 7, 1992 (Calendar No. 1). Decided
September 29, 1992.

Rodney A. Wright was convicted following a bench trial in the
Detroit Recorder's Court, Kaye Tertzag, J., of second-degree
murder and possession of a firearm during the commission of a
felony. The Court of Appeals, CAVANAGH, P.J., and McDONALD
and MARILYN J. KELLY, JJ., affirmed in an opinion per curiam
(Docket No. 107152). The defendant appeals, asking whether a
defendant may voluntarily waive the right against self-
incrimination without the knowledge that an attorney is trying
to contact the defendant.

In an opinion by Justice MALLETT, joined by Justice LEVIN,
and opinions by Chief Justice CAVANAGH and Justice BRICKLEY,
concurring in the result only, the Supreme Court: Reversed the
judgment of the Court of Appeals and remanded the case to the
Detroit Recorder's Court for a new trial.

Justice MALLETT, joined by Justice LEVIN, stated that the
rights against self-incrimination, to remain silent, and to coun-
sel afforded by Const 1963, art 1, § 17, include being informed
by the police of attempted contact in person by retained coun-
sel.

The right against self-incrimination is guaranteed by both
the United States and Michigan Constitutions and includes the
rights to remain silent and to counsel. Waiver of these rights
must be knowing, intelligent, and voluntary under the totality
of the circumstances. A suspect's knowledge of the presence of
retained counsel is relevant to the voluntariness of a waiver.
The critical inquiry is whether information withheld by the
police would have changed the appraisal and understanding of
the circumstances of the waiver.

Under Michigan law, the defendant did not make a knowing,
voluntary, and intelligent waiver of his rights when, before he
made a statement, the police refused to inform him that
retained counsel tried or was trying to contact him. Without
this knowledge, he could not make a truly voluntary waiver of
his essential rights.

Under these circumstances, the police could not prevent the

defendant from having contact with retained counsel, even if he had waived his *Miranda* rights. In this case, it may be concluded that the defendant did not knowingly or voluntarily waive his *Miranda* rights, requiring reversal for a new trial, at which his statements to the police should be suppressed.

Chief Justice CAVANAGH, concurring, stated that where an attorney takes diligent steps to inform police of the representation of and wish to contact a suspect in custody, the police must take prompt and diligent steps to inform the suspect of that fact, or render subsequent statements by the suspect inadmissible as taken in derogation of the right to counsel. In this case the police conduct violated the defendant's right to counsel under Const 1963, art 1, § 20.

Justice BRICKLEY, concurring, stated that under Michigan law determination of the validity of a waiver of rights while in police custody focuses primarily on the coerciveness of the conditions surrounding the waiver. Although whether a waiver was knowing and intelligent is considered, the analysis of the conditions under which it was made predominates; voluntariness is the touchstone of the inquiry. Interrogation incommunicado affects the voluntariness of a waiver because it undermines a person's will, making the suspect highly susceptible to police assertiveness, and suggests that coöperation will be advantageous whether or not statements are true.

Because the defendant was subjected to an eleven-hour interrogation incommunicado, during which he was deprived of food, sleep, and contact with friendly outsiders, he did not validly waive his right to remain silent and thus his statements should have been suppressed.

Reversed and remanded.

Justice RILEY, joined by Justices BOYLE and GRIFFIN, dissenting, stated that while the police conduct in this case may have been objectionable, it did not amount to a constitutional violation. It did not invalidate the defendant's voluntary waiver of his right to counsel. Rather, the police refused access to the defendant by his attorney because he had waived his right during custodial interrogation. A waiver of rights requires a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. The defendant testified several times that he understood the right and elected to waive it. The police-initiated questioning was not barred because the defendant did not indicate that he wished to consult an attorney.

Nor is there evidence that the defendant's lack of sleep or lack of food overbore his will to make a statement. Perhaps if

he had known that the attorney retained by his family was present, he would have spoken with him and would not then have given his statement. However, that possibility does not invalidate his waiver of the right of counsel, which he made voluntarily and with knowledge of his rights and that the statement would be used against him in court.

186 Mich App 566; 465 NW2d 339 (1990) reversed.

*Frank J. Kelley,* Attorney General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief, Research, Training and Appeals, and *Jeffrey Caminsky,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Rolf E. Berg*) for the defendant.

Amicus Curiae:

*Peter Jon Van Hoek* and *Kristina Dunne* for the Criminal Defense Attorneys of Michigan.

MALLETT, J. We are asked today to consider whether a criminal defendant can voluntarily waive his Fifth Amendment rights without the knowledge that his attorney is trying to contact him. Further, we are asked to determine whether not providing a defendant with food, water, or the opportunity or place to sleep while he awaits questioning renders his statements involuntary.

I

Defendant Rodney Agustus Wright shot and killed Clifford "Terry" Harrell during the early morning hours of March 7, 1987. Around midnight, Mr. Harrell's car became stuck in the mud across the street from defendant's house. He asked defendant and other residents for help. A fight ensued between Mr. Harrell and some of the by-

standers. Mr. Wright went to his house, retrieved his shotgun, and unloaded it on the front porch. After unsuccessfully attempting to break up the fight, he went back to his porch, loaded the gun, and again tried to stop the fight. However, in the midst of the affray, the gun discharged, fatally wounding Terry Harrell.[1]

At about 5:00 A.M., Rodney Wright was arrested for shooting Terry Harrell. He was taken to the Fourteenth Precinct, and, after approximately four and one-half hours, he was transferred to the homicide section of police headquarters. At police headquarters, he was put into a room adjoining the office of Sergeant George Taylor, where he remained for approximately one and one-half hours.

Rodney Wright was first questioned by Sergeant Taylor between 10:30 and 10:50 A.M. Mr. Wright asked for, but was denied, permission to phone his grandfather. Sergeant Taylor then took defendant into his office where he advised him of his rights and defendant agreed to make a statement. Sergeant Taylor, however, did not take the statement. Instead, he told defendant that he wanted to search his home, which Mr. Wright gave him permission to do. Again, defendant asked to use the phone. Sergeant Taylor told him that he did not have time for telephone calls. He then led defendant into a smaller room, about four feet by five feet, and left defendant there for roughly four hours.

While in the second room, defendant was never offered anything to eat or the opportunity to go to

---

[1] There is varying testimony on this point. Some witnesses testified that Rodney Wright threatened the victim with the gun, aimed, and pulled the trigger, but no bullet was discharged, then pulled the trigger again, fatally wounding Mr. Harrell. Other witnesses disagreed with this account of events. All agreed, however, that Terry Harrell was the aggressor in the fight.

sleep. By the time Sergeant Taylor returned, Rodney Wright had been in custody for over nine hours. He was taken out of the room once at about 2:00 P.M. to get some water, but still was not allowed to make the requested telephone call.

At about 3:00 P.M., Mr. Wright was brought back into Sergeant Taylor's office. It was at this time that defendant learned that Terry Harrell had died. According to the defendant, at this time police officers tried to convince him to confess to the murder. The police encouraged defendant to admit that he killed in retaliation to Mr. Harrell's beating him. He was to confess in order to prevent them from charging him with "murder one."

Instead of confessing, Mr. Wright denied all guilt. He was then returned to the four by five room. Sergeant Taylor told defendant that he was lying and that he was being put in this room so that the next time the officers came to get him, Mr. Wright would be ready to talk.

The second time Sergeant Taylor confronted defendant, they went into Sergeant Taylor's office. Rodney Wright said that he was ready to make a statement, but as the defendant was talking, the phone rang. Sergeant Taylor talked to the person on the phone, hung up, and told Mr. Wright that he had just spoken with Mr. Wright's uncle. When asked why he did not let defendant speak, Sergeant Taylor said that as soon as defendant made his statement, he could call his uncle.

Without being re-read his rights, defendant gave a statement to Sergeant Taylor. When the statement was typed and signed, Sergeant Taylor allowed defendant to make a phone call and then told him that his attorney was waiting for him outside.

When Rodney Wright was asked if he wanted an

attorney that morning, he had told the officers that he did not have one. The officers told him that one would be provided for him, but did not indicate when. They also never informed him that his family had hired an attorney or that the attorney, Thaddeus Dean, had been trying to contact him since the morning.

In fact, Mr. Dean came to police headquarters while Sergeant Taylor searched defendant's home. He spoke to Sergeant Ralph Wolfolk, who did not allow him to see defendant. Sergeant Wolfolk called Sergeant Taylor who informed him that defendant knew his rights and did not want an attorney. Mr. Dean left for a short time and returned while Sergeant Taylor was talking to defendant. He again asked to see defendant. Again, Sergeant Wolfolk called Sergeant Taylor, and, again, Sergeant Taylor said defendant did not want an attorney.

After Mr. Wright made and signed the statement, the officers told him that his family hired an attorney for him and that Mr. Dean was present. The police officers also allowed defendant to make a phone call at this point.

Defendant was charged with first-degree murder and possession of a firearm during the commission of a felony. Before defendant's trial, the defense filed a motion to suppress the statement made to Sergeant Taylor. At defendant's *Walker*[2] hearing, Judge Sharon Tevis Finch found that defendant wanted to make a statement and never explicitly asked for a lawyer. She also concluded, relying on *Moran v Burbine,* 475 US 412; 106 S Ct 1135; 89 L Ed 2d 410 (1986), that the police purposely kept defendant from his attorney. She concluded that although the police conduct was reprehensible, the

[2] *People v Walker (On Rehearing),* 374 Mich 331; 132 NW2d 87 (1965).

law did not require the suppression of defendant's statements.

During a bench trial, defendant testified that he got the gun in order to stop the fight, that Terry Harrell came at him, grabbed at the gun, and that it accidentally discharged. Judge Kaye Tertzag found defendant guilty of second-degree murder and felony-firearm. Defendant was sentenced to seven to twenty years for murder and a consecutive two-year term for felony-firearm.

Defendant appealed in the Court of Appeals. 186 Mich App 566; 465 NW2d 339 (1990). The panel felt that *Moran v Burbine, supra,* was nearly identical on its facts. Although the United States Supreme Court concluded that states are free to impose more stringent standards on police conduct, the panel declined to do so.

Defendant then appealed here. We granted leave to consider whether a defendant has a right to know of his attorney's efforts to contact him. We also granted leave to determine whether the failure by police to provide a defendant with proper food, water, or opportunity to sleep, renders a defendant's statements involuntary.

## II

A defendant's right against self-incrimination is guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution and by the Michigan Constitution of 1963, art 1, § 17. This includes the rights to remain silent and to be represented by an attorney. In *Miranda v Arizona,* 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966), the United States Supreme Court held that "[t]he defendant may waive effectuation" of these rights "provided the waiver is made voluntarily, knowingly and intelligently." The inquiry is two-

fold. First, a suspect's waiver must be the product of "a free and deliberate choice rather than intimidation, coercion, or deception." *Moran, supra* at 421. Second, the waiver must be made with full knowledge of the right being relinquished and the consequences of this choice. "Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* at 421. Accentuating the importance of these rights, the Court stated "[a]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda* at 476.

A defendant's decision to speak is clearly his own and must be made with full knowledge of its consequences. We have held that the Fifth and Fourteenth Amendments require a clear demonstration of waiver. *People v Paintman,* 412 Mich 518, 528; 315 NW2d 418 (1982). Further, we have held that under Const 1963, art 1, § 17, involuntary confessions are inadmissible at trial. *People v Louzon,* 338 Mich 146, 153-154; 61 NW2d 52 (1953). We must determine, thus, whether defendant's statements were voluntary under the totality of the circumstances. *People v Robinson,* 386 Mich 551, 558; 194 NW2d 709 (1972).

III

Although the United States Supreme Court has held that a defendant's knowledge of his attorney's presence is irrelevant to the voluntariness of a waiver, we disagree. *Moran v Burbine, supra.* In *Moran,* the defendant confessed to the murder of a young woman after being informed of his *Miranda*

rights. While the defendant was in police custody, his sister retained an attorney to represent him. At no point during the interrogation did the defendant request an attorney. The attorney telephoned the police station and was assured that all questioning would cease until the next morning. However, the interrogation period that resulted in the defendant's confession occurred later that evening. The Supreme Court held that defendant's waiver of his *Miranda* rights was valid, despite the false assurances by the police to the attorney and the fact that the police did not inform the defendant that his attorney tried to contact him.

The standard enunciated in *Moran* is simply the minimum; states are free to afford their citizens greater protection than that granted by the federal government. As the Court stated in *Moran:*

> Nothing we say today disables the States from adopting different requirements for the conduct of its employees and officials as a matter of state law. [475 US 428.]

The Court further conceded that on "facts more egregious than those presented here police deception might rise to a level of a due process violation." *Id.* at 432. In so stating, the Court acknowledged the reprehensibility of such police deception, but denied to do so on constitutional grounds.

IV

Other states have considered this question and have concluded that it is necessary for a suspect to be informed of an attorney's attempted contacts.[3]

---

[3] See, e.g., *Haliburton v State,* 514 So 2d 1088 (Fla, 1987); *People v Houston,* 42 Cal 3d 595; 230 Cal Rptr 141; 724 P2d 1166 (1986) (superseded by legislative action, see *People v Ledesma,* 204 Cal App 3d 682; 251 Cal Rptr 417 [1988]); *Roeder v State,* 768 SW2d 745 (Tex

For example, in *State v Stoddard,* 206 Conn 157; 537 A2d 446 (1988), the defendant was arrested outside his home for murder two days after police discovered the victim's body. Before leaving with the police, the defendant briefly spoke with his girlfriend.

While the defendant was being taken to the station and booked, his girlfriend contacted an attorney. The attorney proceeded to make the first of four phone calls to the Bridgeport police station. He was never allowed to speak with the defendant. Each time, however, he was told that the defendant was not at the station; therefore, he did not go there in person.

After the third call, the attorney ceased trying to contact his client until the next morning, when he was told, for a fourth time, that the defendant was not there. The defendant confessed to murder mid-morning, still without knowledge that his attorney was trying to contact him.

The Supreme Court of Connecticut held, contrary to the United States Supreme Court, that under state law, a suspect

> must be informed promptly of timely efforts by counsel to render pertinent legal assistance. Armed with that information, the suspect must be permitted to choose whether he wishes to speak with counsel, in which event interrogation must cease, or whether he will forego assistance of counsel, in which event counsel need not be afforded access to the suspect. [206 Conn 166-167.]

The court reasoned that the police do not have the right to prevent a suspect from exercising the choice to which he is constitutionally entitled by

App, 1988); *Wisconsin v Middleton,* 135 Wis App 2d 297; 399 NW2d 917 (1986).

being dishonest with counsel or by keeping a suspect uninformed of counsel's efforts. *Id.*

Similarly, in *Bryan v Delaware*, 571 A2d 170, 175 (Del, 1990), a defendant who was charged with first-degree murder moved to suppress statements made to the police while he was unaware that his attorney was trying to contact him. His attorney repeatedly asked police not to question the defendant in his absence. The court asked whether a knowing waiver of the right to counsel can occur, as guaranteed under the Delaware Constitution, when the state prevents counsel from rendering legal assistance to his client during custodial interrogation.

The court concluded that the denial of the assistance of counsel violates due process of law. 571 A2d 175. The Delaware Constitution guarantees:

> [A]n accused be afforded the unqualified opportunity to consult with counsel prior to custodial interrogation, provided that (i) the lawyer has clearly made a reasonable, diligent and timely attempt to render legal advice or otherwise perform legal services on behalf of his client, the accused, and (ii) the lawyer has been specifically retained or designated to represent the accused. [*Id.* at 175.]

The court did not distinguish between attempts in person and attempts over the phone to contact a client. *Id.*

In *State v Haynes*, 288 Or 59; 602 P2d 272 (1979), the court found that a suspect who has previously been told of his right to counsel, and who waives this right, must be informed when counsel actually tries to contact him. The suspect must voluntarily and intelligently reject an opportunity to see counsel before further statements can be taken and used against him. *Id.* at 61-62.

In *Haynes,* the defendant was arrested on suspicion of murder. While he was in custody, his wife retained an attorney. When the attorney tried to arrange a visit with the defendant, he was told that Mr. Haynes was not at the jail. The attorney called back and received the same response. He then called another local jail and was told that Mr. Haynes was at the one he had previously called. He went to the jail, after calling and telling a police sergeant that he was coming. About the time he arrived, another sergeant was escorting the defendant into a car. During the drive, the defendant incriminated himself.

The court found that when, unknown to the suspect, an identified, retained attorney is available and trying to consult with him and the police do not inform him of that fact, any statement or fruits of the statement obtained when the police know of the attorney's efforts are inadmissible because the person did not knowingly and intelligently waive his right to counsel. *Id.* at 69-70. "Thus it is not a generalized right to counsel that the decisions we have quoted enforce but, more concretely, the derivative right to the benefit of counsel's efforts to forestall involuntary and incriminating disclosures." *Id.* at 71. The court determined that a defendant may still waive his right to counsel once he knows of his attorney's efforts. However, the court emphasized that it is crucial that the defendant make a knowing, as well as voluntary, choice. *Id.*

The critical inquiry is whether the information withheld by the police would have changed the defendant's appraisal and understanding of the circumstances of the waiver. *State v Stoddard,* 206 Conn 175. Other relevant factors include the relationship between the attorney and the defendant, the nature of counsel's request, the conduct of the

suspect, and the extent to which the police had reasonable notice of counsel's request. *Id.*

### V

With these factors in mind, we now turn to the case before us. Defendant's attorney, retained by his grandfather, originally tried contacting him late in the morning of the day he was arrested. He went to the police station asking to see defendant, but was told that the defendant was advised of his rights and did not desire an attorney. Mr. Wright was never informed that his family retained counsel on his behalf or of his attorney's multiple attempts to see him. Mr. Wright repeatedly requested Sergeant Taylor's permission to call his family because he wanted and needed his grandfather's advice. Meanwhile, Sergeant Taylor spoke to defendant's uncle while defendant was present, still not allowing defendant to talk to him. Sergeant Taylor also knew that an attorney was trying to reach defendant.

Mr. Dean spent a good part of his day at the police station attempting to see Mr. Wright. When asked at the time he was given the *Miranda* warning, whether he wanted an attorney, Mr. Wright responded that he did not have counsel.[4]

---

[4] During Mr. Wright's *Walker* hearing, his attorney questioned him about how he was informed of his rights:

> *Q.* When they asked you if you wanted an attorney, what did you tell them?
> *A.* I told them I didn't have an attorney.
> *Q.* Did they tell you that they would go out and get one for you?
> *A.* They said one would be provided.
> *Q.* Did they tell you when one would be provided?
> *A.* No, they didn't.
> *Q.* Did they tell you that one was available for you right then?
> *A.* No.

He was then put into a small room and left for hours. Later in the day, he was accused of lying, and told that if he did not want to be charged with first-degree murder, he should formulate a story for the police. Eventually, Mr. Dean was informed, as he was trying to obtain a writ of habeas corpus, that Mr. Wright had made a written statement and that he could now see him.

As Justice Stevens so eloquently stated, "[t]he recognition that ours is an accusatorial, and not an inquisitorial system nevertheless requires that the government's actions, even in responding to this brutal crime, respect those liberties and rights that distinguish this society from most others." *Moran* at 436 (Stevens, J., dissenting). Accordingly, under our state's laws, we conclude that Mr. Wright did not make a knowing, voluntary, and intelligent waiver of his rights when the police, before he made a statement, refused to inform him that retained counsel tried or was currently trying to contact him. Without this knowledge, Mr. Wright could not make a truly voluntary waiver of his essential rights. Given the opportunity to speak to a specific, retained and available attorney, Mr. Wright's decision may have been different. As the Oregon Supreme Court stated:

> To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice, whatever might be arranged in the long run. A suspect indifferent to the first offer may well react quite differently to the second. If the attorney appears on request of one's family, that fact may inspire additional confidence. [288 Or 72.]

It is our belief that if defendant knew that a retained attorney was waiting for him, he would

not have waived his right to silence or to counsel. While we do not wish to burden law enforcement with more regulations or to complicate the ability of the police to conduct an investigation, we cannot allow a defendant's Fifth Amendment rights to be ignored in this manner. The police, under these circumstances, could not constitutionally prevent Mr. Wright from having contact with retained counsel who had been trying to reach him, even if the defendant had already waived his *Miranda* rights.

Under Const 1963, art 1, § 17, a criminal suspect is given the right against self-incrimination, a right similar to that provided in the Fifth Amendment of the United States Constitution. This Court has held that the interpretation of our constitutional privilege against self-incrimination and that of the Fifth Amendment are the same. *In re Moser,* 138 Mich 302, 305; 101 NW 588 (1904). However, as the United States Supreme Court concluded in *Moran,* states are free to adopt more protective standards under state law. Because we believe that it was necessary, in order to allow Mr. Wright to make a knowing and fully voluntary waiver of his Fifth Amendment rights, we extend the rights afforded under Const 1963, art 1, § 17, to include information of retained counsel's in-person efforts to contact a suspect.

To hold otherwise would suggest "that a State has a compelling interest, not simply in custodial interrogation, but in lawyer-free, incommunicado custodial interrogation." *Moran* at 437 (Stevens, J., dissenting). The police should have informed Mr. Wright of his retained counsel's attempts to contact him.

VI

Finally, because we conclude that defendant did

not knowingly or voluntarily waive his *Miranda* rights, there is no need to consider whether the deprivation of food, water, or the opportunity or place to sleep while he awaited questioning rendered his statements involuntary.

### CONCLUSION

Because we believe that Mr. Wright should have been informed of counsel's in-person attempts to contact him in order to knowingly and voluntarily waive his Fifth Amendment rights, we reverse the Court of Appeals decision, and order a new trial at which defendant's statements to the police are to be suppressed. We find that Mr. Wright's confession, made without this knowledge, violated the rights afforded under the Michigan Constitution. Statements made under such circumstances are neither voluntarily nor knowingly made, and therefore cannot be used against a defendant. Deliberate subterfuge by the police to prevent counsel from contacting a suspect is reprehensible and unconstitutional. Mr. Wright, under this state's constitution, was entitled to such knowledge in order to make an informed decision regarding his rights.

Reversed and remanded.

LEVIN, J., concurred with MALLETT, J.

CAVANAGH, C.J. I concur in the result reached by my Brother MALLETT. I believe that the analytical approach employed by my colleague of interpreting Michigan's constitutional privilege against self-incrimination, Const 1963, art 1, § 17, more broadly than the United States Supreme Court interpreted the Fifth Amendment in *Moran v Burbine,* 475 US 412; 106 S Ct 1135; 89 L Ed 2d 410 (1986), is entirely supportable, and I agree

with it as far as it goes.[1] I write separately, however, to express my view that my colleague's conclusion is even more clearly supported on the ground that the police conduct in this case violated the defendant's right to counsel under Const 1963, art 1, § 20.[2]

I

In interpreting our state constitutional right-to-counsel provision, this Court must recognize the law as it existed in Michigan at the time Const 1963, art 1, § 20 was adopted. As this Court recently declared: "[I]t must be presumed that a constitutional provision has been framed and adopted mindful of prior and existing laws and with reference to them." *People v Kirby,* 440 Mich 485, 492; 487 NW2d 404 (1992); see also *People v*

---

[1] I agree with my colleague's reliance, for persuasive support, upon the decisions of other state courts that have rejected the reasoning of *Moran v Burbine.* See *ante,* pp 148-152. I would add to those cases the recent decision by an Illinois appellate court in *People v McCauley,* 228 Ill App 3d 893; 595 NE2d 583 (1992).

[2]     In every criminal prosecution, the accused shall have the
     right . . . to have the assistance of counsel for his defense
     . . . . [Const 1963, art 1, § 20.]

There is some overlap between the privilege against self-incrimination (commonly referred to as "*Miranda* rights," see *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 [1966]) and the right to counsel. The two rights, however, "vindicate different interests . . . . While *Miranda* concerns compulsion, the right to counsel cases are concerned with the integrity of the adversarial process." Loewy, *Police-obtained evidence and the constitution: Distinguishing unconstitutionally obtained evidence from unconstitutionally used evidence,* 87 Mich L R 907, 928 (1989).

The police deception in this case threatens the adversarial system by allowing the police to manipulate the interrogation process. The police can, thanks to this Court's decision in *People v Cipriano,* 431 Mich 315; 429 NW2d 781 (1988), purposely delay the arraignment of a suspect. Now we are being asked to sanction police efforts, during that prearraignment period, to obstruct the suspect's lawyer's attempts to contact and advise his client, and to keep the suspect in the dark about the lawyer's attempts.

*Bullock,* 440 Mich 15, 32-37; 485 NW2d 672 (1992)
(interpreting Const 1963, art 1, § 16 more broadly
than the federal Eighth Amendment on the basis,
in part, of established federal and state case law
preceding the adoption of the 1963 constitution).

It was established long before the adoption of
the Michigan Constitution of 1963 that it is unlaw-
ful, in this state, for the police to deny an attorney
access to his client. See *People v Cavanaugh,* 246
Mich 680, 686; 225 NW 501 (1929):

> [H]olding an accused incommunicable, is con-
> demned by every principle of fairness, . . . is for-
> bidden by the constitutional guaranty of due pro-
> cess of law, and inhibited by the right of an
> accused to have the assistance of counsel. . . .
> Holding an accused incommunicable to parents
> and counsel is a subtle and insidious method of
> intimidating and cowing . . . .

Although this Court in *Cavanaugh* was clearly
concerned, in part, with the alleged refusal of
police to honor a *suspect's* requests to see parents
or legal counsel, the holding clearly encompassed
the refusal of police to honor requests by a lawyer
and others to see the suspect. The Court, for
example, quoted police testimony that the suspect

> "did not ask me to see Father Dunnigan nor to see
> his lawyer. . . ."
> "I don't remember [the suspect] asking to see his
> father, *but I do remember his father asking to see*
> [*him*], *and I told him he could not see him.* . . . I
> don't recall [the suspect] asking to see an attorney.
> *I remember when you (defendant's attorney) asked*
> *to see him, and we refused you permission to see*
> *him* . . . ." [*Id.* at 687. Emphasis added.]

Citing these facts, and not just the alleged refusal
by police to honor the suspect's *own* requests to

see outsiders, the Court condemned such conduct and declared:

> In this State a parent may not be denied the right to see and have conversation with a child in jail and accused of crime. *Neither may police, having custody of one accused of crime, deny an attorney, employed by or in behalf of a prisoner, the right to see and advise the accused.* [*Id.* at 688. Emphasis added.]

This Court has previously recognized that *Cavanaugh,* although not specifying which constitutional provision it was applying, must have been referring to the state constitutional guarantee of "due process of law" then contained in Const 1908, art 2, § 16, and now embodied in Const 1963, art 1, § 17. See *People v Conte,* 421 Mich 704, 722; 365 NW2d 648 (1984). But *Cavanaugh* also declared that the police conduct violated the right of an accused "to have the assistance of counsel," *Cavanaugh,* 246 Mich 686, a phrase taken verbatim from Const 1908, art 2, § 19, the antecedent of Const 1963, art 1, § 20. It seems clear that the *Cavanaugh* Court employed the general phrase, "due process of law," to refer to then § 16 (now § 17) and the more specific phrase, "the assistance of counsel," to refer to then § 19 (now § 20). In any event, it is clear that *Cavanaugh,* in view of its reference to the law "[*i*]*n this State,*" *id.* at 688 (emphasis added), was not referring to any rights under the federal constitution; rather, it was referring to the rights existing under our state constitution.[3]

---

[3] In 1929, the federal privilege against self-incrimination and right to counsel had not yet been held to apply to the states. See, e.g., *Twining v New Jersey,* 211 US 78; 29 S Ct 14; 53 L Ed 97 (1908) (refusing to apply the federal privilege against self-incrimination to the states); *Powell v Alabama,* 287 US 45; 53 S Ct 55; 77 L Ed 158

The United States Supreme Court, in *Moran v Burbine, supra,* stated that while the police conduct at issue did not violate the Fifth Amendment right to counsel, the Sixth Amendment right to counsel would prohibit such conduct after that right has attached:

It is clear, of course, that, absent a valid waiver, the defendant has the right to the presence of an attorney during any interrogation occurring after the first formal charging proceeding, the point at which the Sixth Amendment right to counsel initially attaches. And we readily agree that once the right *has* attached, it follows that the police may not interfere with the efforts of a defendant's attorney to act as a " 'medium' between [the suspect] and the State" during the interrogation. [475 US 428. Emphasis in original; citations omitted.]

In Michigan, the federal limitation on when the right to counsel attaches, enunciated in *Kirby v Illinois,* 406 US 682; 92 S Ct 1877; 32 L Ed 2d 411 (1972), was at least partially rejected in *People v Anderson,* 389 Mich 155; 205 NW2d 461 (1973), and *People v Jackson,* 391 Mich 323, 338; 217 NW2d 22 (1974) ("independent of any Federal constitutional mandate, . . . both before and after commencement of the judicial phase of a prosecution, a suspect is entitled to be represented by counsel at a corporeal identification or a photographic identification . . ."). Although *Jackson* and *Anderson* were not explicitly premised on either the Sixth Amendment or Const 1963, art 1,

(1932) (applying only a limited version of the federal right to counsel to the states); *Betts v Brady,* 316 US 455; 62 S Ct 1252; 86 L Ed 1595 (1942) (same); *Gideon v Wainwright,* 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963) (overruling *Betts* and at last applying the federal right to counsel in full force to the states); *Malloy v Hogan,* 378 US 1; 84 S Ct 1489; 12 L Ed 2d 653 (1964) (overruling *Twining* and at last applying the federal privilege against self-incrimination in full force to the states).

§ 20, they support the view that prearraignment events can trigger our state constitutional right to counsel.

The *Kirby* restriction on the right to counsel is an arbitrary one and should not be adopted for purposes of interpreting the Michigan Constitution. The arbitrariness of the limitation is demonstrated by *Patterson v Illinois*, 487 US 285; 108 S Ct 2389; 101 L Ed 2d 261 (1988), where the Court held that postindictment *Miranda* waivers are sufficient only until an actual attorney-client relationship is established. The Court emphasized that nothing changed at the time of formal charging if there was no attorney-client relationship yet established:

> We note as a matter of some significance that petitioner had not retained, or accepted by appointment, a lawyer to represent him at the time he was questioned by authorities. Once an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect. [*Patterson,* 487 US 290, n 3.]

The converse must also hold true: If an attorney-client relationship exists before arraignment, nothing will change at the time of arraignment to cause the right to counsel to suddenly blossom where none existed before. Our Court has correctly recognized that there are "critical stages" in prosecution that can occur before formal charging. See, e.g., *Anderson* and *Jackson, supra.* In my view, custodial interrogation of an accused who is represented by counsel is just such a situation.[4] And the

---

[4] The dissent suggests that this view of our state constitutional right to counsel is precluded by dicta appearing in *People v Bladel (After Remand),* 421 Mich 39, 52; 365 NW2d 56 (1984), and *People v Crusoe,* 433 Mich 666, 685-686; 449 NW2d 641 (1989). See Riley, J.,

police can be held accountable for knowing that the accused is represented by counsel "to the extent that the attorney or the suspect informs the police of the representation." *Moran,* 475 US 460, n 46 (Stevens, J., dissenting).[5]

*post,* p 173, n 4. This Court in *Bladel* was not presented with the issue when the right to counsel attaches for state constitutional purposes, because it was undisputed that the interrogations in *Bladel* took place subsequent to arraignment, and that the right to counsel, even under the more restrictive federal Sixth Amendment standard, had clearly attached. See *Bladel,* 421 Mich 45-46, 52. My opinion for the Court in *Bladel* simply cited the prevailing federal rule; I did not suggest that a different interpretation of the state constitution was foreclosed. Any such suggestion would have been mere dicta in any event. Likewise, in *Crusoe,* the Court merely referred to the prevailing federal rule, and did not engage in any analysis of whether the state constitutional right to counsel should be interpreted differently. In any event, I continue to believe that *Crusoe* was wrongly decided. See *Crusoe,* 433 Mich 697-709 (CAVANAGH, J., joined by LEVIN and ARCHER, JJ., dissenting). My own reference, in my *Crusoe* dissent, to the prevailing federal rule regarding attachment of the right to counsel, was, as in *Bladel,* passing dicta unaccompanied by analysis. That reference occurred in a footnote explaining why it was *"unnecessary to review"* the question whether a Sixth Amendment right-to-counsel violation occurred in that case. See *id.* at 698, n 1 (emphasis added).

[5] Justice MALLETT, applying his self-incrimination analysis, states that "[w]e must determine . . . whether defendant's *statements* were voluntary under the totality of the circumstances." *Ante,* p 147 (emphasis added). More precisely stated, the inquiry is whether the defendant's *waiver of his rights* was voluntary. That question does ultimately turn on a consideration of the totality of the circumstances. However, the essence of my colleague's holding, as I perceive it, is that the type of police deception and interference with the right to counsel presented by this case is *alone* sufficient to render the waiver involuntary, without regard to other obtaining circumstances. This is consistent with Justice Stevens' persuasive reasoning in his dissent in *Moran v Burbine,* 475 US 450-456.

Under my right-to-counsel approach, of course, it is unnecessary to address any question of "voluntariness under the totality of the circumstances," nor is it necessary to address, as Justices Stevens and MALLETT do, whether the suspect's knowledge that his attorney is immediately available and trying to contact him is sufficiently important, in context, to render the suspect's waiver of rights generally invalid for self-incrimination purposes when the police withhold or conceal that crucial knowledge. The fact that the defendant in this case purported to waive, in general terms, his right to counsel, is simply irrelevant under my analysis. A defendant cannot knowingly and intelligently waive his *specific* right to speak with an attorney who is immediately available and trying to contact him, when he is unaware that the attorney *is* available and trying to contact him.

· II

My Brother MALLETT, in summarizing his analysis, states:

> [W]e conclude that Mr. Wright did not make a knowing, voluntary, and intelligent waiver of his rights when the police, before he made a statement, refused to inform him that retained counsel tried or was currently trying to contact him. [*Ante,* p 153.]

Yet, in concluding his opinion, my colleague limits this sound rule, without explanation, to situations where the police withhold "information of retained counsel's *in-person* efforts to contact a suspect." *Ante,* p 154 (emphasis added). I would not so limit the rule established by today's decision.

In my view, the difference between telephone contact and in-person contact by an attorney does not rise to the level of constitutional significance. *Moran v Burbine* itself involved telephone contact, and neither the majority nor the dissent in that case appeared to vest any importance in that fact. See 475 US 420 (describing the question presented); *id.* at 468 (Stevens, J., dissenting) (noting

---

Because I would hold that a suspect faced with custodial interrogation has the *specific* right, as part of his overall right to counsel, to be informed of his attorney's attempts to contact him, a waiver of that right cannot be valid when the police merely inform the suspect, in generalized terms, that he has the right to a lawyer if he wishes. Rather, the waiver can only be valid if the suspect is timely and accurately informed of his attorney's immediate availability and attempts to contact him, and *then* knowingly, intelligently, and voluntarily waives the right to see the attorney.

Once it is established that a statement has been obtained in derogation of the right to counsel, it is, of course, automatically subject to exclusion on that ground. See, e.g., *Brewer v Williams,* 430 US 387, 397; 97 S Ct 1232; 51 L Ed 2d 424 (1977) (noting that right-to-counsel holding rendered it "unnecessary to evaluate the ruling of the District Court that Williams' self-incriminating statements were, indeed, voluntarily made"); *Massiah v United States,* 377 US 201; 84 S Ct 1199; 12 L Ed 2d 246 (1964).

that the suspect "was not told that his attorney had *phoned*") (emphasis added). This does not mean that police would necessarily be required to permit the attorney to advise the suspect over the telephone:

> The state constitutional right to counsel requires that police relay a message—however received—that the suspect's attorney wishes to speak with him. If upon receiving that message the suspect indicates his desire to speak with counsel, questioning must cease. The police may still insist that the attorney come to the station before the attorney may *speak* with the suspect. [*People v Houston,* 42 Cal 3d 595, 616; 230 Cal Rptr 141; 724 P2d 1166 (1986).]

Rather, as one court has held:

> The key factor should be whether the attorney has reasonably informed the police that he represents the suspect and not the methodology by which the police are informed. [*People v McCauley,* 228 Ill App 3d 893, —; 595 NE2d 583, 586 (1992).]

I agree with Justice MALLETT that the police conduct in this case was "reprehensible and unconstitutional." *Ante,* p 155. But I do not see how the reprehensibility or unconstitutionality of this type of conduct is materially affected by whether the suspect's attorney attempts to contact his client in person or by telephone. Drawing such fine distinctions does not serve the goal of providing law enforcement officials with clear guidance regarding their constitutional responsibilities. I would hold simply that *if an attorney takes diligent steps to inform the police that he represents and wishes to contact a suspect held in custody, the police must take prompt and diligent steps to inform the sus-

pect of that fact, or render subsequent statements by the suspect inadmissible as taken in derogation of the right to counsel.

BRICKLEY, J. (*concurring*). Today we are asked to consider whether the conditions under which Rodney Wright provided statements to the police, i.e., deprivation of food, sleep, and contact with his attorney, require their suppression. On the basis of well-established Michigan law, I would find his waiver of the right to remain silent involuntary.

I

On March 7, 1987, about 1:00 A.M., Clifford Harrell was shot in the stomach. Rodney Wright was holding the gun when it went off. Wright had retrieved the gun from his house to break up a fight between Harrell and one of Wright's friends, and, during the commotion, the gun was jostled and it discharged. Whether Wright deliberately fired the weapon or whether it fired accidentally is unknown.

After the shooting, Detroit police officers arrived to investigate. They talked to various witnesses who described the events leading up to the incident. On the basis of these statements, the police arrested Rodney Wright at approximately 4 o'clock in the morning. They transported him to the Fourteenth Precinct, and put him into a holding cell. Subsequently, he was transferred downtown to the homicide division after Harrell had died. His transfer occurred just before breakfast was served.

During his wait at the homicide division, the police left him alone in a room with a desk and three hard-backed chairs. Even though he had had no opportunity to sleep, the police did not offer

him a place to rest. When officers would enter the
room, Wright repeatedly asked to speak with his
family—so that they would know he was safe and
advise him about what to do—only to be told that
the only person who could authorize contact was
Sergeant George Taylor. Sergeant Taylor, how-
ever, refused him permission to make a telephone
call until after Wright made a statement.

During this time, Wright decided to coöperate
fully with the police. At 10:00 A.M., Sergeant Tay-
lor escorted Wright to his office. After giving him
*Miranda*[1] warnings, he asked whether Wright
wanted to make a statement and Wright agreed.
He and Sergeant Taylor talked for a short time.
Sergeant Taylor decided not to record this conver-
sation and could not remember its contents when
asked about it at a *Walker*[2] hearing. After inform-
ing Wright that the statement he had given was a
lie, he was placed into another smaller room.
Sergeant Taylor then left to talk with other wit-
nesses.

The witnesses apparently did not inculpate any-
one sufficiently to resolve the case in Sergeant
Taylor's mind. Upon returning from these inter-
views, Sergeant Taylor had Wright brought to his
office. Before talking to Wright, Sergeant Taylor
ordered some fast-food from a local restaurant.
Wright, not having eaten, asked if he, too, could
purchase some food, but Sergeant Taylor ignored
this request and ate his food in front of him.

After Sergeant Taylor finished eating, another
officer came into his office and the two officers
began interrogating Wright. Although it was sev-
eral hours since they had spoken, Sergeant Taylor

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694
(1966).

[2] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87
(1965).

did not repeat the *Miranda* warnings. The officers began by telling Wright that they would charge him with "murder-one," unless he told them something they could use to prevent that charge. Wright, in the hope that he would be allowed to speak with his family, suggested that he and another person wrestled with the gun when it discharged. After putting this version of events in writing, the police ended Wright's isolation, allowing him to call his family and telling him that an attorney hired by his family was waiting to see him.

II

Despite many superficial similarities, Michigan jurisprudence differs from federal jurisprudence in its requirements for a valid waiver of rights. Under federal law, a waiver must be voluntary, knowing, and intelligent. *Johnson v Zerbst,* 304 US 458; 58 S Ct 1019; 82 L Ed 1461 (1938); *Illinois v Rodriguez,* 497 US 177; 110 S Ct 2793; 111 L Ed 2d 148 (1990); *Colorado v Spring,* 479 US 564; 107 S Ct 851; 93 L Ed 2d 954 (1987). No single element predominates. However, Michigan jurisprudence governing the validity of waivers during interrogation focuses primarily on the coerciveness of conditions surrounding the making of the waiver;[3] statements made under coercive condition, are suppressed. See, e.g., *Flagg v People,* 40 Mich 706 (1879); *People v Stewart,* 75 Mich 21; 42 NW 662 (1889); *People v Dudgeon,* 229 Mich 26; 201 NW 355 (1924); *People v Hamilton,* 359 Mich 410; 102

---

[3] This Court stated the general test for waiver in *Book Furniture Co v Chance,* 352 Mich 521, 526-527; 90 NW2d 651 (1958): "Waiver is the intentional relinquishment of a known right. The usual manner of waiving a right is by acts which indicate an intention to relinquish it, or by so neglecting and failing to act as to induce a belief that it was the intention and purpose to waive."

NW2d 738 (1960). Where conditions did not overbear a defendant's will, statements have been held admissible. *People v Brannan,* 406 Mich 104; 276 NW2d 14 (1979); *People v Farmer,* 380 Mich 198; 156 NW2d 504 (1968); *People v Boyce,* 314 Mich 608; 23 NW2d 99 (1946). Although whether a waiver is knowing and intelligent has been considered in certain cases, *People v Collins,* 303 Mich 34; 5 NW2d 556 (1942); *People v Simpson,* 48 Mich 474; 12 NW 662 (1882); *People v Biossat,* 206 Mich 334, 338; 172 NW 933 (1919), analysis of the conditions under which the accused made the relevant statements predominates. For example, in *People v Brockett,* 195 Mich 169, 179; 161 NW 991 (1917), we stated,

> Proof of a confession is never admissible unless it is voluntarily made, and by the word "voluntary" is meant that the confession must be of the free will and accord of the defendant, without coercion whether from fear of any threat of harm, promise or inducement by hope of reward, or method known as "sweating."

This approach continues to be applied. In *People v Brannan, supra* at 118-119, in finding a statement to be admissible, we emphasized the noncoerciveness of the circumstances under which the right to remain silent was waived.

> This is not a case in which police took a person into custody, failed to inform the person of his rights, questioned him insistently until incriminating evidence or some other lever was obtained and then belatedly gave the *Miranda* warnings just before the virtually foregone conclusion of obtaining a formal confession. . . . *Nor is this a case in which the police have isolated the defendant from counsel* or have grilled the defendant in such a way that the ultimate giving of the *Miranda*

warnings . . . was a meaningless gesture. [Emphasis added.]

In sum, voluntariness forms the touchstone of the inquiry concerning the validity of the waivers made while in police custody.

Many cases recognize that incommunicado interrogation—the practice of consciously isolating a suspect from all friendly contact with outsiders to coerce a waiver of the right to remain silent—can undermine a person's will and make him highly susceptible to police assertiveness. *People v White,* 401 Mich 482, 495-497; 257 NW2d 912 (1977); *People v Cavanaugh,* 246 Mich 680; 225 NW 501 (1929); *People v Allen,* 8 Mich App 408; 154 NW2d 570 (1967); Cf. *People v Brannan, supra; People v Arroyo,* 138 Mich App 246; 360 NW2d 185 (1984); *People v Matthews,* 22 Mich App 619; 178 NW2d 94 (1970). In *People v Cavanaugh, supra,* the police arrested the defendant, a juvenile, and ignored his requests to speak with his family, his priest, and his attorney. They also actively interfered with his counsel's attempts to see him. The prosecutor argued that evidence of such police tactics was irrelevant to the voluntariness of the defendant's waiver.[4] This Court disagreed.

> A voluntary confession of commission of an established crime is evidence long sanctioned, but a confession, extorted by mental disquietude, induced by unlawfully holding an accused incommunicable, is condemned by every principle of fairness, has all the evils of the old-time *lettre de cachet,* is forbidden by the constitutional guaranty of due process of law, and inhibited by the right of an accused to have the assistance of counsel. [*Id.* at 686.]

---

[4] Cf. *Moran v Burbine,* 475 US 412; 106 S Ct 1135; 89 L Ed 2d 410 (1986).

That defendant was held incommunicado bears closely on the voluntariness of the waiver.

Incommunicado interrogation affects the voluntariness of a waiver because it suggests that coöperation will be advantageous whether or not the statements are true. As Justice COOLEY explained in *People v Wolcott,* 51 Mich 612, 615; 17 NW 78 (1883), "No reliance can be placed upon admissions of guilt so obtained; for the very obvious reason that they are not made because they are true, but because, whether true or false, the accused is led to believe it is for his interest to make them." Statements made under these circumstances easily may lose their quality as conscience-laden admissions of guilt, *Minnick v Mississippi,* 498 US 146, 156-158; 111 S Ct 486; 112 L Ed 2d 489 (1990) (Scalia, J., dissenting), and become an attempt to please the interrogating officer. In addition, such interrogation turns the safeguards provided by the federal constitution into means to increase the coercive pressure on a suspect. Under federal law, when a person in custody requests counsel, interrogation must cease. *Minnick v Mississippi, supra; Edwards v Arizona,* 451 US 477; 101 S Ct 1880; 68 L Ed 2d 378 (1981); *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). Although interrogation may cease, a defendant's isolation from friendly contact with the outside world does not; it continues unabated. Continued isolation only increases the defendant's incentive to speak with the police and to comply with their demands. Failing to inform the defendant that retained counsel is available immediately leaves a suspect with two unpalatable options: waive the right to remain silent or wait in police custody, not knowing how long it might be before counsel arrives. Seen in this light, a waiver is not the product of a free and deliberate choice. Rather, it derives from

a cruel Hobson's choice imposed as a result of the conscious exclusion of friendly contact with others.

Additionally, federal law requires that the police not interfere with an accused's attempts to contact an attorney. However, a request to speak with family members, even if the accused does not know an attorney to call, need not be honored.[5] *Fare v Michael C,* 442 US 707; 99 S Ct 2560; 61 L Ed 2d 197 (1979); *Ashurst v Marris,* 914 F2d 255 (CA 6, 1990) (decision without published opinion); *United States ex rel Riley v Franzen,* 653 F2d 1153 (CA 7, 1981). I, of course, do not question this rule. However, like the *Edwards* rule, in particular circumstances, it can be destructive of values clearly protected by a long tradition in Michigan jurisprudence. For Wright, it quickly became reasonable to conclude that waiving his right to remain silent was necessary in order for him to get friendly advice because Sergeant Taylor specifically linked contact with family members to making a statement.

Incommunicado interrogation thus poses serious dangers to the voluntariness of an accused's waiver of the right to remain silent. No issue of incommunicado interrogation can arise where the police inform a suspect that a retained attorney is present and immediately available. An accused, fully informed of his right to remain silent and to have counsel present, in the exercise of his judgment may choose to proceed with or without counsel. In that circumstance, the choice belongs to and is made by the accused and not the police. Thus, the careful balance of the interests of legitimate law enforcement and the interest of individuals embodied in the Michigan Constitution remains intact.

[5] The police must honor even an ambiguous request for an opportunity to contact counsel. In some circumstances a request to speak with family members may fall within this rule.

Several aspects of the interrogation process suggest that Wright was held incommunicado for the purpose of coercing a waiver of the right to remain silent. Of these, the most telling is Wright's isolation from any friendly contact with others until after he made a statement. Upon arrest, Wright sought to speak with his family. He wanted to call his grandfather whose judgment he respected and whose advice he would have followed. The police denied all these requests, at first, outright, later, indicating that after making a statement, he would be allowed to make a call. Sergeant Taylor not only did not allow Wright to call, he contacted Wright's family, notified them that Wright was in custody, and indicated that they would have to wait to speak with him. This made it less likely that Wright would receive the advice he wanted.

While waiting Wright's family hired attorney Thaddeus Dean to advise him. When Dean arrived at the station, he was informed that only the officer in charge, Sergeant Taylor, could allow him access to his client. Sergeant Taylor refused Dean access because Wright had not requested an attorney. This forced Dean to leave in order to seek judicial intervention. During the time Dean was gone, Sergeant Taylor took a statement from Wright, and only then was available to advise him.

Other aspects of the interrogation process evince a design to coerce a waiver of the right to remain silent and the right to have counsel present during questioning. When he was brought to the homicide division, Wright was placed in a small room with a table and chairs. He sat in that room for a couple of hours. When Sergeant Taylor returned, he and Wright spoke in the Sergeant's office. At the end of this conversation, Wright was placed, still alone, in an even smaller room. He was told to wait and to be ready to tell the truth when Sergeant Taylor

returned for him. He waited approximately five hours in that room. In addition, Wright, having been awake through the night, was fatigued and hungry. The sum of these circumstances consciously created by the police was strong pressure on Wright to make a statement so that he could speak with his family, sleep, and eat.

Because Wright was subjected to an eleven-hour incommunicado interrogation during which he was deprived of food, sleep, and contact with friendly outsiders, combined with the fact that he was not informed of available retained counsel, I would conclude that Wright never validly waived his right to remain silent during interrogation, and thus his statements should have been suppressed.

RILEY, J. (*dissenting*). This case involves the issues whether defendant's state and federal constitutional right to counsel during custodial interrogation was violated by the failure of the police to tell defendant before he made a statement that an attorney had been retained for him by his family, and whether the conduct of the police, denial of access by the attorney to defendant, and denial to defendant of food and a place to sleep, rendered defendant's statement involuntary. Because I believe that the holding and rationale of the Court of Appeals is correct, I would affirm the decision of the Court of Appeals.

The case the Court of Appeals makes is that defendant had been arrested and was in a custodial setting subject to interrogation by the police. The Fifth Amendment privilege against compulsory self-incrimination, protected by the safeguards in *Miranda*,[1] had therefore attached. The Sixth Amendment right to counsel had not at-

___

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 76 L Ed 2d 694 (1966).

tached, however, because that right attaches only at or after the initiation of adversary judicial proceedings by way of formal charge, preliminary hearing, indictment, information, or arraignment.[2] *People v Bladel (After Remand),* 421 Mich 39, 52; 365 NW2d 56 (1984), citing *United States v Gouveia,* 467 US 180, 187; 104 S Ct 2292; 81 L Ed 2d 146 (1984).[3] Virtually all Michigan case law regarding the right to counsel tracks the analysis by the United States Supreme Court of the Sixth Amendment right to counsel.[4]

[2] I would find that no attorney-client relationship is formed where the defendant voluntarily waives his right to an attorney and he has no knowledge of attempts by an attorney to contact him.

[3] See also *Moran v Burbine,* 475 US 412, 430; 106 S Ct 1135; 89 L Ed 2d 410 (1986), where the Court held that the Sixth Amendment right does not apply before the initiation of adversary judicial proceedings. The Court further reasoned that it makes little sense to say that the Sixth Amendment right to counsel attaches at different times depending upon whether the accused has retained an attorney. And see *People v Wright,* 186 Mich App 566, 569; 465 NW2d 339 (1990).

[4] See, e.g., *People v Bellanca,* 386 Mich 708, 713; 194 NW2d 863 (1972). While we have deviated from federal precedent regarding the right to counsel at pretrial identification procedures, compare *People v Anderson,* 389 Mich 155; 205 NW2d 461 (1973), with *Kirby v Illinois,* 406 US 682; 92 S Ct 1877; 32 L Ed 2d 411 (1972); see also *People v Jackson,* 391 Mich 323; 217 NW2d 22 (1974), our Court in *Anderson* was in fact following federal precedent that was valid at the time. See *United States v Wade,* 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1449 (1967). The general rule remains that a defendant has no right to counsel until the right attaches automatically after the initiation of adversarial judicial criminal proceedings. *Bladel, supra; People v Crusoe,* 433 Mich 666, 685, 698, n 1; 449 NW2d 641 (1989) (CAVANAGH, J., dissenting). The exception for pretrial identification procedures was established before a contrary federal rule was formulated and was maintained because of the unique elements of confrontation that these procedures present. See *Anderson, supra.* Normal custody interrogations have never been analyzed under the right to counsel simply because that right has not yet attached at this investigative stage.

Similarly, in *People v Gonyea,* 421 Mich 462; 365 NW2d 136 (1984), this Court held, in a plurality decision, that statements elicited in violation of a defendant's art 1, § 20 right to counsel are inadmissible for both substantive and impeachment purposes. While under current Sixth Amendment analysis such statements are admissible for impeachment purposes, see *Michigan v Harvey,* 494 US 344; 110 S Ct 1176; 108 L Ed 2d 293 (1990), the *Gonyea* Court relied on federal case

Defendant alleges violation of two corresponding rights guaranteed by the Fifth and Fourteenth Amendments. First, he claims that his waiver of *Miranda* rights was invalid because the police failed to inform him that a lawyer retained by his family had come to the police station to meet with him. Second, he claims that his statement was involuntary because of the denial of food and a place to sleep for the eleven hours before making the statement, as well as the failure to have an arraignment without delay. Nevertheless, for the reasons set forth below, I do not believe that the police actions invalidated defendant's waiver of his right to counsel during questioning. Moreover, I believe that the statements were made voluntarily.

In *Moran v Burbine,* 475 US 412; 106 S Ct 1135; 89 L Ed 2d 410 (1986), the United States Supreme Court addressed facts similar to the present case, and found that the statement was admissible and that the defendant's rights had not been violated. In *Moran,* an attorney retained for the defendant telephoned the police station and was given assurances that the defendant would not be further questioned until the next day. In fact, the interrogation continued that evening, and the defendant gave an inculpatory statement. The Court defined two dimensions of the *Miranda* decision, to be scrutinized by the courts under a totality-of-the-circumstances test: 1) the waiver of rights must be voluntary in the sense that it is the product of a free and deliberate choice rather than intimidation, coercion, or deception; and 2) the waiver must be made with a full awareness of both the

law valid at the time of its decision as a guide to its interpretation of the right to counsel guaranteed by the Michigan Constitution. *Gonyea, supra* at 469. See also *Lucas v New York,* 474 US 911; 106 S Ct 281; 88 L Ed 2d 246 (1985), wherein Justice White, dissenting from a denial of certiorari, noted the conflict existing at that time on this issue.

nature of the right being abandoned and the consequences of the decision to abandon the right. *Id.* at 421.[5] The Court then found:

> Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right. [*Id.* at 422.]

It further held:

> Although highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect's decision to waive his *Miranda* rights unless he were at least aware of the incident. [*Id.* at 423.]

Thus, the conduct of the police, while unethical, is relevant to the constitutional validity of a waiver only "if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Id.* at 424. Furthermore, and most significant to the present case, the Court then held, "[n]or are we prepared to adopt a rule requiring that the police inform a suspect of an attorney's efforts to reach him." *Id.* at 425. The Court cited practical difficulties with such a rule, such as defining the point at which police will be held accountable for knowing that the accused has counsel. *Id.*

The defendant in *Moran* propounded a similar argument to the one asserted in the present case—that if the accused were allowed to speak with retained counsel, he would have made no statement at all. The Court addressed this argument and held:

---

[5] See *Wright,* n 3 *supra* at 568.

Because neither the letter nor purposes of *Miranda* require this additional handicap on otherwise permissible investigatory efforts, we are unwilling to expand the *Miranda* rules to require the police to keep the suspect abreast of the status of his legal representation. [*Id.* at 427.]

While the Court interpreted the Fifth and Fourteenth Amendments, it did indicate that "[n]othing we say today disables the States from adopting different requirements for the conduct of its employees and officials as a matter of state law." *Id.* at 428. It further found that on "facts more egregious than those presented here police deception might rise to a level of a due process violation." *Id.* at 432.

However, while the police in *Moran* lied to the defendant's counsel regarding when the defendant would be questioned, the police in the instant case refused access to defendant by his attorney because defendant voluntarily waived his right to an attorney during the custodial interrogation.[6] In fact, defendant testified that he understood his right to counsel and elected to waive it.[7] The facts of the present case are not more egregious than those in *Moran.*

---

[6] A different question would be presented if it were found as a fact that defendant made an equivocal request for counsel which was responded to by deceitful misrepresentation of his options. Where the police are aware that an attorney is present to represent a client, the failure to respond to an equivocal request for counsel with the knowledge of counsel's presence may be found to be the kind of "police exploitation" which in combination with other circumstances would render a statement involuntary. See *People v Conte,* 421 Mich 704, 756; 365 NW2d 648 (1984) (opinion of BOYLE, J.).

[7] Contrary to the implication by the majority that defendant merely asserted he did not have counsel, rather than clearly waiving his right to counsel, *ante* at 153-154, there are numerous instances where defendant clearly testified that he understood his rights to counsel, he believed it was his choice to make a statement in the absence of counsel, he never requested counsel, and he volunteered to make the statement.

The Supreme Court reiterated the requirements for a valid waiver under the Fifth Amendment in *Patterson v Illinois,* 487 US 285, 292; 108 S Ct 2389; 101 L Ed 2d 261 (1988). There, the Court held that a valid waiver requires "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

In Michigan, this Court has held that the Michigan constitutional privilege against self-incrimination need not be interpreted differently from the United States Constitution. *Paramount Pictures Corp v Miskinis,* 418 Mich 708; 344 NW2d 788 (1984). See also *In re Moser,* 138 Mich 302, 305; 101 NW 588 (1904). Article 1, § 17 of the 1963 Michigan Constitution provides, in part:

> No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law.

Article 1, § 20 then provides that "[i]n every criminal prosecution, the accused shall have the right . . . to have the assistance of counsel for his defense . . . ." There is nothing conspicuous in the language of the Michigan Constitution that would distinguish it from the rights guaranteed by the federal constitution.[8]

---

[8] See discussion in n 4. Furthermore, Michigan case law does not support defendant's assertion that he should be afforded more liberal rights to counsel during interrogation than were afforded him in the present case. In *People v Moore,* 51 Mich App 48; 214 NW2d 548 (1974), the Court of Appeals held that it was not error to admit a statement made by a defendant where the defendant was read his *Miranda* rights, refused to speak without counsel, and then initiated a meeting and at that time waived counsel. "Volunteered statements of any kind are not barred and their admissibility is not affected by the *Miranda* decision." *Id.* at 51. See also *People v Guidry,* 67 Mich App 653, 660; 242 NW2d 461 (1976); *People v Burton,* 74 Mich App 150, 159; 253 NW2d 691 (1977), rev'd on other grounds 401 Mich 415; 258 NW2d 58 (1977).

Defendant cites *People v Cavanaugh,* 246 Mich 680, 686; 225 NW 501 (1929), for the proposition that "[h]olding an accused incommunicable to parents and counsel is a subtle and insidious method of intimidating and cowing, tends to render a prisoner plastic to police assertiveness and demands, and is a trial of mental endurance under unlawful pressure." Not only was *Cavanaugh* decided before the Fifth Amendment became applicable to the states by incorporation through the Fourteenth Amendment, but also in that case the accused had requested to speak with counsel, as well as his parents, which requests were denied.[9] It is clear that the police may not refuse an accused's request for counsel during interrogation. It is inappropriate, however, to fragment the finding in *Cavanaugh* and to assert that an accused has a separate right to call his parents, independent of the right to call counsel. As Sergeant Taylor testified, an accused may be denied a call to his relatives while the preliminary investigation is conducted in order to prevent interference by the accused and his family with evidence or witnesses.

The fact that Sergeant Taylor knew that Mr. Dean had been retained for defendant, and that Mr. Dean was present at the station ready to speak with defendant, may seem an abuse of power by the police. It does not, however, rise to the level of a constitutional wrong. Defendant testified several times that he knew he did not have to make a statement and that he knew he could wait to speak with an attorney before making his statement.[10] Police-initiated questioning is

---

[9] See *Wright,* n 3 *supra* at 568.

[10] There is no constitutional right to "friendly contact with others." BRICKLEY, J., *ante* at 170. The rights guaranteed in *Miranda* do not create a "cruel Hobson's choice," *id.* at 170, between waiving the right to remain silent and waiting for an attorney. The constitutional right

not barred because defendant did not indicate·that he wished to consult an attorney. *People v Crusoe,* 433 Mich 666, 692; 449 NW2d 641 (1989). There is no evidence that his lack of sleep or his lack of food for half a day overbore his will to make a statement.[11] Perhaps if he had known that Mr. Dean was present he would have spoken with him and would not then have given his statement. That does not, however, invalidate his waiver of the right to counsel, which he made voluntarily and with knowledge of his rights and the consequences of making a statement, i.e., that the statement would be used against him in court.

I believe that the right to counsel had not attached, and that defendant knowingly waived his right to consult with an attorney before making his statement.[12] While the police conduct may have been objectionable, it does not amount to a constitutional violation. Thus, I am persuaded that the

to counsel during custodial interrogation guarantees that the defendant may remain silent and wait for an attorney, or elect to make a statement. Defendant understood that the choice existed, and understood he had the right to an attorney and the consequences of waiving that right, therefore, under the facts of the present case, any "conscious exclusion of friendly contact with others" was not unconstitutional. *Id.* at 170.

[11] I recognize that in certain cases police conduct may be extreme and require suppression of any statements made while in custody because the circumstances indicate defendant was coerced. *People v White,* 401 Mich 482; 257 NW2d 912 (1977) (the defendant was held incommunicado for close to thirty hours, never left alone, broke down and cried during interrogation, and was not advised of his right to counsel); *People v Allen,* 8 Mich App 408; 154 NW2d 570 (1967) (the defendant was held incommunicado and deprived of food and sleep for three days and three nights); *People v Hamilton,* 359 Mich 410; 102 NW2d 738 (1960) (the defendant was held incommunicado and interrogated for three days).

However, in the present case, defendant testified that at the conclusion of the eleven-hour detention, during which time the police were investigating the homicide, he still understood that he did not have to make a statement. The conditions of defendant's detention and interrogation do not appear to have overborne his will.

[12] See *Wright,* n 3 *supra* at 570.

decision of the Court of Appeals should be affirmed.

BOYLE and GRIFFIN, JJ., concurred with RILEY, J.